228 N.J. Super. 635 (1988)
550 A.2d 777
MORRIS COUNTY FAIR HOUSING COUNCIL, MORRIS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR ADVANCEMENT OF COLORED PEOPLE AND ALFRED A. SLOCUM, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFFS, AND JOHN AND SALVATORE CORTESE, PLAINTIFFS-INTERVENORS,
v.
BOONTON TOWNSHIP, CHATHAM TOWNSHIP, CHESTER TOWNSHIP, DENVILLE TOWNSHIP, EAST HANOVER TOWNSHIP, FLORHAM PARK BOROUGH, HANOVER TOWNSHIP, HARDING TOWNSHIP, JEFFERSON TOWNSHIP, KINNELON BOROUGH, LINCOLN PARK BOROUGH, MADISON BOROUGH, MENDHAM BOROUGH, MENDHAM TOWNSHIP, MONTVILLE TOWNSHIP, MORRIS TOWNSHIP, MORRIS PLAINS BOROUGH, MOUNTAIN LAKES BOROUGH, MOUNT OLIVE TOWNSHIP, PARSIPPANY-TROY HILLS TOWNSHIP, PASSAIC TOWNSHIP, PEQUANNOCK TOWNSHIP, RANDOLPH TOWNSHIP, RIVERDALE BOROUGH, ROCKAWAY TOWNSHIP, ROXBURY TOWNSHIP AND WASHINGTON TOWNSHIP, DEFENDANTS, AND MORRIS COUNTY PARK COMMISSION, SOUTHWEST MORRIS TOWNSHIP HOMEOWNERS ASSOCIATION, AND BRITT, LARKIN AND POWERS, DEFENDANTS-INTERVENORS. MURWIN DEVELOPMENT CORP., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
THE TOWNSHIP OF MORRIS, IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MORRIS AND THE PLANNING BOARD OF THE TOWNSHIP OF MORRIS, DEFENDANTS. HOLLOW HILL ASSOCIATES, A GENERAL PARTNERSHIP UNDER THE LAWS OF NEW JERSEY, PLAINTIFF,
v.
TOWNSHIP OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE MORRIS TOWNSHIP PLANNING BOARD, DEFENDANTS.
Superior Court of New Jersey, Law Division, Morris County and Mercer County.
Decided July 29, 1988.
*638 Stephen Eisdorfer, Assistant Deputy Public Advocate, for plaintiffs Morris County Fair Housing Council et al. (Alfred A. Slocum, Public Advocate, attorney).
Thomas F. Collins, Jr., for plaintiffs-intervenors John and Salvatore Cortese (Vogel, Chait, Schwartz & Collins, attorneys).
James R. Hillas, Jr. for defendant Morris Township Planning Board.
Stephan C. Hansbury for defendant-intervenor Morris County Park Commission (Hansbury, Martin & Knapp, attorneys).
Lisa K. Pantel for defendant-intervenor Southwest Morris Township Homeowners Association (Schenck, Price, Smith & King, attorneys).
Louis P. Rago for defendant-intervenor Britt, Larkin and Powers.
SKILLMAN, J.S.C.
Morris Township is one of the defendants in the Mount Laurel action brought by the Public Advocate against various municipalities in Morris County. See Borough of Morris Plains v. Dept. of Public Advocate, 169 N.J. Super. 403 (App. Div. 1979), certif. den. 81 N.J. 411 (1979) and Morris Cty. Fair Housing Council v. Boonton Tp., 209 N.J. Super. 393, 441-443 (Law Div. 1985), aff'd in part, rev'd in part sub. nom. Hills Development Co. v. Bernards Tp., 103 N.J. 1 (1986), for a more complete account of the history of this lawsuit. On March 29, 1984, the Public Advocate and Morris Township entered into a settlement agreement under which Morris Township agreed to provide 535 units of lower income housing. The agreement provided for 100 of these units to be provided by publicly subsidized senior-citizen housing, another 100 units to be provided by the addition of apartments in existing single-family homes, and the remaining 335 units to be provided by rezoning *639 11 properties for high density residential housing, of which 20% would be affordable to lower income persons. This court approved the settlement and implementing zoning ordinance amendments and issued a final judgment of compliance on August 20, 1984. This judgment was affirmed on appeal. Morris Cty. Fair Housing Council v. Boonton Tp., 209 N.J. Super. 108 (App.Div. 1986).
Plaintiff-intervenors John and Salvatore Cortese are the owners of one of the properties rezoned for Mount Laurel housing by Morris Township as part of its settlement with the Public Advocate. The Cortese site consists of Lots 82A and 85 in Block 304. Lot 82A is 7.4 acres and Lot 85 is 30.4 acres. The two lots touch only at a single point.
Under the Public Advocate's settlement with Morris Township, the Cortese property was rezoned for residential housing at a maximum density of five dwelling units an acre. The Corteses filed an application with the planning board for preliminary site plan approval of a 189-unit development, of which 38 units which would be affordable to lower income persons. All of the units were proposed to be constructed on Lot 85. The plans provided for the stormwater on this lot to be directed to a reservoir located on Lot 82A and then to be released from the reservoir to downstream properties. The plans also provided for a single motor vehicular access to the property by a driveway leading from Picatinny Road, with emergency motor vehicular access to be provided by means of a roadway leading from Hillcrest Avenue.
After a ten-day hearing, the planning board denied the Corteses' application for site plan approval. The board's memorializing resolution, dated October 19, 1987, quotes the report of its planning consultant, Harvey Moskowitz, in its entirety and simply adopts the conclusions set forth in that report. Thus, the board adopted Moskowitz's conclusion that the site plan fails to give proper consideration to: (1) site constraints and holding capacities; (2) impact on site; (3) provision of necessary *640 amenities; (4) aesthetic and visual impact; (5) circulation and access limitations; and (6) inadequate visitor parking. The board also adopted Moskowitz's ultimate conclusion that "[t]he site plan suffers from too many units on a difficult tract," and therefore, "[t]he numbers should be reduced to address the deficiencies noted in this, as well as other reports."
In addition to adopting these conclusions of its planner, the board also concluded that the Corteses had failed to submit an adequate stormwater management plan. The board noted that a dam, which is part of the reservoir on Lot 82A, was in need of repairs and/or modification, which would be subject to approval by the Commissioner of the Department of Environmental Protection (DEP). The board also noted that the assistant township engineer had stated that "he could not adequately review the sufficiency of applicant's stormwater management plan until the question of dam safety had been passed upon by the appropriate reviewing authorities." Accordingly, the board concluded that "the lack of design date for the stormwater detention facilities, including the earthen dam, makes it impossible for the Board to make an informed decision."
Finally, the board noted that a major issue presented by the site plan application was "whether access should be confined to a single entrance off Picatinny Road or if a second access either full or emergency should be constructed to Hillcrest Avenue/Dorothy Drive on the opposite side of the project." However, the board concluded that since it had denied the site plan application on other grounds, there was no need for it to address this access issue.
The Corteses challenge the denial of their application for site plan approval by a motion in aid of litigant's rights pursuant to R. 1:10-5. The Morris County Park Commission and two groups of local objectors to the Corteses' proposed development have been permitted to intervene to support the board's decision.
*641 I am unable to conclude that the planning board violated the settlement agreement between the Public Advocate and Morris Township or acted arbitrarily, capriciously or unreasonably in deciding that the nature and extent of the repairs and modifications to the dam and reservoir which will be required by the DEP create so much uncertainty as to the Corteses' stormwater management plan that their site plan cannot be approved at this time. Therefore, I affirm the board's resolution denying site plan approval.

I.
N.J.S.A. 40:55D-38(b)(3) provide that any municipal ordinance governing site plan applications must require adequate plans for storm water drainage. In accordance with this statutory directive, section 57-75(A)(4) of the Morris Township land development ordinance provides:
The stormwater disposal system for any land area in the township shall be devised in such a manner that:
(a) The rate and/or velocity of stormwater runoff from said area shall not be increased over that which occurs under existing conditions.
(b) The drainage of adjacent areas is not adversely affected.
(c) Soil erosion during or after development is not increased over what naturally occurs.
(d) Soil absorption and groundwater recharge capacity of the area is not decreased below that which occurs under existing conditions.
In their stormwater management plan, the Corteses envision that all the stormwater from the 30-acre lot which they plan to develop will drain into the Jones Woods Reservoir on their adjoining 7-acre lot. The water will be temporarily retained in the reservoir and then discharged to downstream locations. The embankment of the reservoir consists in part of an earthen dam. The dam is in poor condition and the Corteses plan to repair it. The Corteses also plan to replace the existing outlet pipes from the reservoir and to construct a new emergency spillway. These plans must be approved by the Commissioner of the DEP. See N.J.S.A. 58:4-1.
*642 In denying the Corteses' site plan application, the planning board stated:
[T]he lack of design data for the stormwater detention facilities, including the earthen dam, makes it impossible for the Board to make an informed decision. The Board rejects the concept that the entire matter should be relegated to other authorities.
It is well established that "[a] local zoning determination will be set aside only when it is arbitrary, capricious or unreasonable. Even when doubt is entertained as to the wisdom of the action, or as to some part of it, there can be no judicial declaration of invalidity in the absence of a clear abuse of discretion by the public agencies involved." Kramer v. Bd. of Adjustment of Sea Girt, 45 N.J. 268, 296-297 (1965) [citations omitted].
It is also well established that if a site plan lacks sufficient specificity or if an applicant has failed to provide information pertinent to a plan, the plan may be denied on that basis. Thus, in Field v. Franklin Tp., 190 N.J. Super. 326, 332-333 (App.Div. 1983) the court observed:
It is evident that a municipality cannot guide the use and development of lands in this state if fundamental elements of a development plan are left unresolved before preliminary approval, leaving them instead for an unspecified later day. Certain elements  for example, drainage, sewage, disposal and water supply  may have such a pervasive impact on the public health and welfare in the community that they must be resolved at least as to feasibility of specific proposals or solutions before preliminary approval is granted. If the applicant fails to provide sufficient information on the fundamental elements of his plan, preliminary approval should be denied. [citations omitted]
See also Hilton Acres v. Klein, 35 N.J. 570, 586 (1961); Hamlin v. Matarazzo, 120 N.J. Super. 164, 171 (Law Div. 1972).
The Corteses' engineering consultant, Kevin G. Page, acknowledged that the repair of the reservoir would have environmental impacts. In a letter to the DEP he stated:
The applicant may fill 0.015 acres of wetlands, if any during the construction of the dam modifications. During such time there will potentially be an increase in soil erosion and sedimentation. To minimize the adversity of these impacts, a *643 soil erosion and sediment control plan has been developed and will be instituted during construction.
In addition, the Corteses' environmental consultant, John H. Crow, indicated that the extent of environmental impacts from the dam, and recommendations for measures to deal with those impacts, could not be determined until after there was an approved plan for the repair of the dam:
When the consulting engineers and regulatory agencies have determined the required improvements to the dam [J.H. Crow Company] will provide an impact assessment and recommendations specific to those changes.
Page also indicated that, as of the time he testified before the board, he had not yet completed his calculations with respect to the stormwater flow into the reservoir:
Q. With respect to the storm water management plan, are you satisfied from a safety and an environmental perspective that the lake will be protected, as reasonably possible, after development and during the course of development?
A. Well, I would like to couch my words in just saying that under our proposal, I have not finalized my calculations.
Under our proposal there is no question, I believe, that the integrity of that lake will be safer. As to whether or not it will be safe, I will reserve that until I finalize my calculations.
Q. Okay. Indeed, until the DEP actually approves the dam safety permit?
A. Correct.
Later Page testified:
Let me just say regarding the reservoir, we are working with two geotechnical firms who are providing the consulting work to the Applicant on the stability of the embankment.
I am still waiting for their comments, because I feel that any comments from me regarding the embankment, or from Dr. Crow regarding the embankment, are not the level of expertise that I want to have on a geotechnical issue.
An engineer who testified on behalf of the Southwest Morris Township Homeowners Association, J. Staats Brokaw, III, testified that in view of the uncertainties as to the required repairs to the dam, the Corteses' stormwater management plan was not sufficiently definite to predict what water flows would result from the project:
The consequence of what I call the misapplication of the hydrologic theory is going to be one of two things, either you are going to get a lot more flow bypassing the reservoir, which means downstream property owners, Route 24, Fosterfields [sic] development will get flooded out because the water won't be *644 stored, ... [or] more flows will go through the reservoir than what you predict and you would have a greater surge on the dam which is not in such terrific shape and you could have the possibility of a dam failure.
So I believe those are the consequences for trying to statistically predict an event that I do not believe in the present circumstances is statistically predictable with the type of accuracy and the computer demands.
....
As the project is currently planned, it is, therefore, my opinion, that the project does not adequate [sic] address the health, welfare and safety issues ... and I also put forth the opinion that .. . [approval of] this project subject to the securing of all of the state permits, is not really fulfilling your obligation as far as notification of the public as to the details of the project because, I believe, that the project would change substantially in scope and configuration as it wades its way through the process of securing those various permits.
Most significantly, Robert P. Adams, the assistant township engineer, advised the board in a letter, dated May 22, 1987, that in view of the existing uncertainties concerning the required repairs and modifications of the reservoir and the dam, his office could not approve the Corteses' stormwater management plan:
Since some of the measures to be taken by the owner may affect the pond's storage capacity and corresponding stormwater management plan, the Township Engineering Office cannot approve of anything with respect to drainage at this time. Depending upon the measures ordered by the N.J.D.E.P., the Engineering Office may recommend that the Stormwater Management Plan be approved by the N.J.D.E.P. in conjunction with the Dam Safety Standards.
The foregoing evidence provided a sufficient foundation for the planning board's conclusion that it did not have sufficient information to assess the adequacy of the Corteses' stormwater management plan. The record clearly indicates that the reservoir and dam require substantial repairs and modifications. The record also clearly indicates that there is a direct relationship between the Corteses' plan for stormwater drainage from Lot 85 and the detention capacity of the reservoir on Lot 82A. Thus, until the DEP approves a specific plan for repairs and improvements to the reservoir and dam, there will be continuing uncertainty as to the adequacy of the Corteses' *645 storm drainage plan.[1] Accordingly, I find nothing unreasonable in the board's conclusion that the Corteses failed to provide sufficient information concerning fundamental aspects of its stormwater drainage plan. Cf. Field v. Franklin Tp., supra.
The Corteses note that the DEP has exclusive authority under N.J.S.A. 58:4-5 to determine what repairs or modifications of the dam are required to make it safe. Therefore, they argue that the planning board should grant site plan approval conditioned upon the applicant later securing the requisite approval from the DEP for the modifications of the reservoir and dam. In support of this argument, the Corteses rely upon N.J.S.A. 40:55D-22(b), which provides:
In the event that the development proposed by an application for development requires an approval by a governmental agency other than the municipal agency, the municipal agency shall, in appropriate instances, condition its *646 approval upon subsequent approval of such governmental agency. [Emphasis supplied]
In this case, the planning board did not abuse its discretion in concluding that this was not an "appropriate instance" for the grant of site plan approval subject to approval of proposed modifications of the dam by the Commissioner of DEP. The modifications required in the reservoir and dam, which are subject to review by the Commissioner of DEP, are directly related to the adequacy of the Corteses' stormwater management plan, which the planning board has the responsibility to pass upon. Therefore, the board reasonably concluded that it could not determine the adequacy of the Corteses' stormwater management plan until the Commissioner of DEP decided what modifications must be made in the reservoir and dam.

II.
Due to this court's conclusion that the Corteses' site plan application was properly denied based upon deficiencies in its stormwater management plan, it is unnecessary to consider the board's alternative grounds for denying the application. However, for the guidance of the parties, it is appropriate to comment briefly upon certain inadequacies in the board's memorializing resolution.
A planning board is obligated to set forth findings of fact and conclusions of law when passing upon an application for site plan approval. See Commons v. Westwood Bd. of Adjustment, 81 N.J. 597, 610 (1980). Without such findings and conclusions, the applicant and other interested parties have no way of knowing the basis for the board's decision and the reviewing court is unable to determine whether the board acted properly. Ibid.
The board's memorializing resolution in this case consists almost entirely of quotations from experts' reports, especially with respect to the planning and density issues. Such wholesale incorporation of the contents of expert reports does *647 not fulfill the board's responsibility to make findings of fact and conclusions of law. In making factual findings, the board is obligated to consider all the evidence in the case rather than merely to accept as factual every statement made by its own planning consultant. Moreover, the board must explain how its findings support its ultimate legal conclusions.
A number of statements made in Moskowitz's report are inconsistent with other evidence in the record and are apparently erroneous. For example, the Moskowitz report states that "[t]he applicant's engineer estimated 60 percent of the entire site would be occupied by buildings, parking and roads" even though the record seems to indicate that only 32.5% of the site will be covered by buildings, parking and roads. The Moskowitz report also states that "the applicant is proposing as his market units extremely large townhouses, with ... 3,600 square feet for two stories," even though the record seems to indicate that most of the proposed units will be approximately 2,500 square feet and none will exceed 2,900 square feet. The Moskowitz report further states that the units will be 30 feet in width, even though the record seems to indicate that most of the units would be 25 feet or less in width. The record does not indicate what weight the board gave to these apparently erroneous factual findings, but these findings should be reconsidered in light of the whole record if the Corteses renew their site plan application.
In addition, some of the grounds relied upon by Moskowitz for denial of the Corteses' application raise legal issues which should have been addressed by the board. For example, the Moskowitz report states that "[u]sing contemporary recreation standards, at least two tennis courts and a swimming pool should be required on the site." However, the report does not cite any section of the Morris Township zoning ordinance or other authority for imposing this requirement upon the developer. Likewise, Moskowitz's report refers to adverse "aesthetic and visual impacts" and "inadequate visitor parking" as further *648 grounds for denying the Corteses' application. However, it does not cite any provision of the Morris Township zoning ordinance relating to parking or building setbacks which the plan violates, nor does it provide any authority for the board to impose requirements relating to those subjects which exceed those mandated by the zoning ordinance. See PRB Enterprises v. South Brunswick, 105 N.J. 1, 7 (1987); Sheston Oil Co. v. Borough of Avalon Planning Bd., 214 N.J. Super. 593 (App. Div. 1987), certif. den. 107 N.J. 134 (1987).
There is yet another deficiency in the board's resolution. The Corteses urged that their development plan was consistent with section 75-79D(6) of the Morris Township zoning ordinance, which imposes an 80-unit limit on the number of dwelling units which may be located on a cul-de-sac. In the alternative, the Corteses sought a waiver from this requirement. However, the board failed to even deal with this issue in its resolution. In addition, the Corteses urged that the 8% maximum grade for driveways permitted by section 57-114 of the zoning ordinance was inapplicable to its roadway system or, in the alternative, it sought a waiver from this requirement. Again, the board's resolution fails to address the issue. For the reasons previously indicated, the board's failure to address Corteses' waiver applications does not mandate automatic approval of their entire application, as urged by the Corteses. However, the board should have addressed all issues raised by the Corteses' site plan application and related waiver requests in its memorializing resolution in order to permit judicial review of the entire matter in a single proceeding.
Finally, this court notes that all parties, with the exception of the objectors, appear to agree that a master should be appointed at this time to facilitate the development of the Cortese site in accordance with the terms of the Public Advocate's settlement with Morris Township. Accordingly, this court will enter an order affirming the board's denial of the Corteses' application *649 for site plan approval, but also providing for the appointment of a master and mandating the issuance of complete findings of fact and conclusions of law with respect to any renewed application for site plan approval which may be filed by the Corteses.
NOTES
[1] The Morris County Park Commission has intervened in this proceeding in support of the denial of the Corteses' site plan application. It is noteworthy that the Commission's primary concern is that it cannot assess the full impact of the Corteses' proposed development on the adjoining land they own because there are too many uncertainties regarding the proposed stormwater management plan. The commission stated the following in its brief filed with this court:

It is clear that the dam at Jones Reservoir will require repair, replacement or elimination. These efforts will be substantial and will significantly alter the balance of the development of the Cortese Property. The hydrology of the adjacent Fosterfields' property will be altered. Without any reasonable idea as to the final accepted drainage system and the location of buildings, it is impossible to properly evaluate the environmental impact of this development on adjacent downstream property owners such as the Morris County Park Commission. It is clear that the development as currently proposed, cannot be constructed. It is appropriate and essential to the public interest that the Planning Board be permitted the opportunity to review a plan which includes a workable drainage system. Only then, can adjacent property owners evaluate the impact upon their property of the final development plan. Forcing the Planning Board to accept the development conditioned upon the approval of the Department of Environmental Protection regarding dam safety, will prevent the Planning Board, local citizens and adjacent property owners from their right to participate in the process of development and to protect their property interests.