851 A.2d 110 (2004)
370 N.J. Super. 319
NEW YORK SMSA, Limited Partnership d/b/a/ Verizon Wireless, Plaintiff-Respondent,
v.
BOARD OF ADJUSTMENT OF TOWNSHIP OF WEEHAWKEN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 2004.
Decided June 29, 2004.
*112 James J. Burke, Hoboken, and Daniel E. Horgan, Secaucus, argued the cause for appellants (Waters, McPherson, McNeill and James J. Burke & Associates, attorneys; Mr. Burke and Mr. Horgan, of counsel; Joseph W. Grather, on the brief).
Gregory J. Czura, Ringwood, argued the cause for respondent (Czura Stillwell, attorneys; Mr. Czura, on the brief).
Before Judges KING, LINTNER and LISA.
*111 The opinion of the court was delivered by KING, P.J.A.D.
Defendant, Zoning Board of Adjustment of the Township of Weehawken (Board), appeals from the reversal of its denial of a use variance for the construction of a wireless communications facility. Plaintiff, New York SMSA Limited Partnership (Verizon), proposed to install antennas on the roof of a residential apartment building and place telecommunications equipment in the building's basement. In rejecting Verizon's application, the Board concluded that the proposal did not satisfy the positive or negative criteria for the grant of a use variance. In the Law Division action in lieu of prerogative writ, Judge Curran reversed, finding that the Board's memorializing resolution was palpably deficient and its actions clearly arbitrary, capricious and unreasonable.
On appeal, the Board contends that Verizon failed to establish a special reason for the grant of a use variance because it did not prove that there is a "significant gap" *113 in service in the Township. In asserting this argument, the Board confuses claims based on the New Jersey Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -136, with claims based on the Federal Telecommunications Act of 1996(TCA), 47 U.S.C.A. § 332(c)(7) (2004). Verizon does not contend that the Board's action violated the TCA by effectively prohibiting the provision of wireless services in the Township. Rather, it maintains that it was entitled to a use variance under the MLUL as applied in cases such as Smart SMR of N.Y., Inc. v. Bor. of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 704 A.2d 1271 (1998). The sole point at issue on this appeal is whether Verizon satisfied the positive criteria of N.J.S.A. 40:55D-70(d).
The record amply supports the Law Division judge's conclusion that the Board's action was arbitrary, capricious and unreasonable. The memorializing resolution sets forth no factual findings to support the Board's decision. Moreover, the record reveals no facts from which the Board could have reasonably concluded that Verizon failed to satisfy the requirements of N.J.S.A. 40:55D-70(d). We affirm for the reasons given by Judge Curran in her written opinion which we review below.

I
On July 9, 2001 Verizon applied for a use variance and preliminary and final site plan approval to install a wireless communications facility at an apartment building located in Weehawken's B-1/B-2 High-Rise Multi-Family/Business Zone. The Board conducted public hearings on Verizon's application on January 22, February 12, and February 26, 2002. A motion to deny the application was passed by unanimous vote on February 26, 2002. A resolution memorializing the denial was then adopted.
On April 11, 2002 Verizon filed a complaint in lieu of prerogative writ in the Superior Court, Law Division, asking the judge to set aside the Board's action and declare that Verizon was entitled to approval of its application. Judge Curran heard oral argument on the matter on November 15, 2002 and issued a written opinion reversing the actions of the Board.

II
Weehawken is an urban community located directly across the Hudson River from mid-town Manhattan. The Township lies in an area of heavy traffic congestion, in close proximity to the New Jersey Turnpike, I-495, and the Lincoln Tunnel. Verizon currently operates two wireless communications facilities in the Township: one on a commercial building in the waterfront district; the other on the Town Hall, which is near I-495.
Dominic Villecco, Verizon's radio frequency engineering expert, testified that the Township's location and topography create problems for wireless communications services. The northern portion of Weehawken sits on a ridge 160 feet above the river and is exposed to radio frequency signals coming from Manhattan to the east and the New Jersey Turnpike to the south and west. Cell phone users in this area have difficulty placing and maintaining calls because their cell phones detect signals from more than a dozen different sites. The over-abundance of signals creates interference that renders wireless communications services unreliable.
Villecco explained that in order to operate properly, cell phones must be able to identify a dominant server, i.e., a site with a signal significantly higher than other surrounding sites. In northern Weehawken, however, there is no dominant server. As he described the situation: "The crowd [of servers] is very large and the phone *114 basically gets lost in the shuffle, lost in the noise." The only way to solve the problem is to construct a new cell site that would establish a dominant server in the area. However, the signal from such a server must be very focused. Otherwise, it would traverse the horizon and exacerbate signal interference problems in Manhattan.
Villecco presented a topographic map and transparent overlays to illustrate the coverage problem in the Township which we examined at oral argument. He explained that the overlay maps were based on computer propagation models developed by Motorola and used throughout the world. Referring to the overlay of existing coverage, he described the gap in reliable service as being roughly one-half mile long by one-quarter mile wide. He said that even though the area is fairly small, it has a high population density and heavy traffic congestion.
Villecco chose a five-story, residential apartment building at 117 Parkview Avenue as the ideal location for the new cell site. He proposed to place fifteen antennas, arranged in three sets of five, on the building's roof. All of the antennas would be narrowly focused to serve only the gap area. He explained that the height and location of the building allowed the site to provide extremely selective coverage. The site would solve the gap problem, yet keep excess signal off the horizon and out of Manhattan. He presented an overlay map of predicted coverage from the site, which we also examined, showing that the proposed facility would fill in service gaps in the northern section of Weehawken and part of Union City as well as along JFK Boulevard.
Villecco described the unique suitability of the proposed site:
So this site then, what it did for us is it gave us the ability to see all the problem areas that we have. It's not that high of a site so it doesn't put that much extra signal on the horizon and create more of the interference problem than we already have, which is really just a function of growth and evolution of the network. And it would give us the ability to point these very specific narrow beam antennas in the areas where they had problems so that we can keep the radio signal controlled but focused.
In responding to questions from the Board, Villecco explained that a municipally owned water tower in the Township's B-1 Shopping Center Business Zone would not be a suitable location for the new cell site. He said that the tower, which is 150-feet tall, is located on the western edge of the gap area. In order to provide coverage in the gap, it would be necessary to mount antennas high on the tower and face them directly east. At an elevation of 300 feet relative to Manhattan, the antennas would put excessive signals in the air and aggravate interference problems. "What it would do there is it would create more of the same problem that we have and eventually we have to build an additional site just because it wouldn't solve our problems because it exacerbates interference." He also explained that mounting more antennas on the Town Hall would duplicate service along I-495 and not solve the coverage problem. He concluded that there was no other potential location that would solve the coverage problem as effectively as the proposed site.
Peter Longo, Verizon's site engineer, described the physical characteristics of the proposed site. A total of fifteen panel antennas, each four feet tall, sixteen inches wide, and twelve inches deep, would be mounted on the apartment building roof. Five antennas would be mounted on the southeastern corner of the building, extending to five feet above the parapet wall. A second set of five antennas would be *115 similarly mounted on the northwestern corner of the building. A third set of antennas would be flush-mounted on the western corner, with no antennas extending above the parapet wall. At their maximum, the top of the antennas would be sixty-three feet above ground level. Verizon's electronic equipment would be housed in a room in the building's basement. Cables would run from the equipment room to the roof through a cable tray attached to the side of the building painted to match the facade.
Peter Tolischus testified on behalf of Verizon as a licensed professional planner. He observed that the Township Council adopted an ordinance on December 12, 2001 which prohibited cellular communications towers and limited the use of cellular communications antennas to the B-1 Shopping Center Business Zone and the SW Special Waterfront Zone. He explained that Verizon's application required a d(1) "use" variance because the proposed site is not located in a B-1 or SW zone.
Tolischus presented numerous photographic simulations of what the apartment building would look like with the antennas installed. We also examined these at oral argument. He said that the application met all of the positive criteria for the issuance of a "use" variance because the proposed site would enhance cellular communications and eliminate the need for construction of a tower. He also asserted that the proposal satisfies the negative criteria as well, stating that "based on ... my visual analysis, I don't see there's any substantial visual impact from these antennas. They are quite visible from one particular viewpoint. But otherwise, they are obscured by telephone poles, traffic signs, vegetation, other vertical elements." He concluded that mounting antennas on the roof of an apartment building is not inconsistent with a residential use and pointed out that the building site is "sandwiched" between two major roadways. Noting that one of the busiest intersections in the Township is directly north of the building, he observed, "It's not as if we were in the middle of a block, so to speak, with residential all around us."
Tolischus explained that the reason for not mounting all of the antennas flush with the facade is that the building extends to the property line on the southeastern and northwestern sides. If the antennas were facade-mounted on those sides, they would violate the air space of neighboring property owners. He testified that it would be possible to mitigate the negative impact of the non-flush antennas, however, by placing them behind a visually opaque plastic screen.
The Board presented no experts on its own behalf. Brief testimony from the public reflected some general concerns about the impact of the antennas on property values, medical effects of radio frequency radiation, and the visual detriment of the antennas.
During deliberations, Board Member Racli stated that he did not understand why Verizon needed such a large room in the building's basement to house its equipment. He also commented that Villecco "said whatever was convenient for him" and that "height doesn't mean anything anymore" with regard to cellular communications. Board Member D'Andrea stated that Verizon had presented no evidence of a lack of service in the area. Jill Hartman, the Board's planner, commented that Verizon should be required to comply with the Township's telecommunications ordinance. Chairman Cabrera expressed concern about the aesthetic impact of the antennas and noted the remarks from a member of the public about property values. He stated that he did not understand why Verizon could not place the *116 antennas on the water tower or the Town Hall and concluded that Verizon had created its own problems by giving away free weekend minutes. Verizon's application was denied by a vote of six to zero.
The Board's memorializing resolution states that Verizon is denied a use variance to place the antennas on the apartment building roof and a bulk variance to install antennas at a height of sixty-three feet. The denial of the bulk variance is hard to understand. Longo testified that the top of the antennas would be sixty-three feet above ground level and that the roof already had chimneys and stair penthouses that extended to a height of sixty-six feet. The Township's telecommunications ordinance permits antennas to extend up to three feet above the highest point of a siting structure. Thus, no height variance is required for the antennas.
After summarizing the testimony and arguments before the Board, the resolution provided:
Therefore, the Board finds that the Applicant has not demonstrated that the application for a use variance and bulk variances to allow antennas on the roof of the Property met the positive criteria required for a use variance and the Applicant has not demonstrated that such relief could be granted without detriment to the community. Moreover, the variance granted could not be given without violating the intent or purpose of the Master Plan and the Zoning Ordinance of the Township of Weehawken, which now includes a specific zone allowing cellular antennas to be placed.
The resolution set forth no further findings of fact or conclusions of law.
In reversing the variance denial, Judge Curran observed that "the Board has not presented a record which demonstrates a clear decision or balancing of the positive and negative factors and offers no analysis of those factors within the record or the resolution." The judge found that
the applicant has clearly demonstrated through the testimony of its three expert witnesses that a significant gap exists, that this site is particularly suited for the purposes of the installation, that there was careful consideration of alternate sites and that this facility is the least intrusive means of addressing the problems of inability to originate calls or to prevent calls from being "dropped."
Commenting on the lack of a factual basis for the Board's decision, Judge Curran observed: "There is no demonstration of a significant negative impact, which would result from the approval of this facility; there is no legitimate proffer of alternative sites, which were ignored by the applicant; there is no careful balancing under Sica." She concluded that the actions of the Board were "without foundation" and were "clearly arbitrary, capricious, unreasonable and lacking in support in the record provided."

III
The Board contends that its decision to deny Verizon's variance request was not arbitrary, capricious, or unreasonable. It argues that the court erred by failing to examine the entire record for support of the decision. It acknowledges that the resolution "may have stated its conclusions in a summary fashion" but maintains that the record substantially supports the variance denial. It also asserts that Verizon failed to prove that the proposed use is particularly suited for the site because it did not establish the existence of a significant gap in cellular service. Finally, it claims that it properly rejected Villecco's opinions because his testimony was subjective, conclusory, and without foundation.
*117 Judge Curran reversed the Board because she concluded that its decision was unsupported by either the memorializing resolution or the record. Because the Board did not raise the issue, the judge did not specifically consider whether Villecco's testimony constituted a net opinion. However, in reaching her decision, the judge relied on Villecco's testimony and noted that the testimony of Verizon's experts was "clear, cogent and clearly directed to providing the information needed."
The decision of a municipal zoning board is entitled to substantial deference. Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). Due to its "peculiar knowledge of local conditions," a municipal board must be afforded wide latitude in the exercise of its delegated discretion. Pierce Estates Corp., Inc. v. Bridgewater Tp. Zoning Bd. of Adjustment, 303 N.J.Super. 507, 514, 697 A.2d 195 (App.Div.1997). Courts reviewing a municipal board's action on zoning applications are limited to determining whether the board's decision was arbitrary, unreasonable, or capricious. Med. Ctr. at Princeton v. Princeton Zoning Bd. of Adjustment, 343 N.J.Super. 177, 198, 778 A.2d 482 (App.Div.2001). Because variances should be granted sparingly and with great caution, courts must give greater deference to a variance denial than to a grant. Nynex Mobile Communications Co. v. Hazlet Tp. Zoning Bd. of Adjustment, 276 N.J.Super. 598, 609, 648 A.2d 724 (App.Div.1994).
The same standard of review applies to an appellate court. Charlie Brown of Chatham v. Bd. of Adjustment of Chatham, 202 N.J.Super. 312, 321, 495 A.2d 119 (App.Div.1985). However, because the interpretation of a statute or ordinance presents essentially a legal issue, conclusions of a municipal board on matters of statutory interpretation are not entitled to any particular deference. Atlantic Container, Inc. v. Eagleswood Planning Bd., 321 N.J.Super. 261, 269, 728 A.2d 849 (App. Div.1999). Despite the fact that "an applicant bears a heavy burden in overcoming a denial," Pierce Estates Corp., 303 N.J.Super. at 515, 697 A.2d 195, the evidence presented here in support of Verizon's challenge to the Board decision is compelling.

IV
The Board first argues that the summary nature of its memorializing resolution is irrelevant because the verbatim public hearing transcripts, the local antenna ordinance, and Verizon's computer-simulated photographs all support its decision. The Board also contends that the resolution is legally sufficient because a board is required to set forth its reasons in detail only when it grants a variance application. It maintains that in the case of a denial, "a board need not prove a negative beyond a statement that there is no record evidence to support a particular element of the variance process."
The requirement of a memorializing resolution is set forth in N.J.S.A. 40:55D-10(g), which provides:
The municipal agency shall include findings of fact and conclusions based thereon in each decision on any application for development and shall reduce the decision to writing. The municipal agency shall provide the findings and conclusions through:
(1) A resolution adopted at a meeting held within the time period provided in the act for action by the municipal agency on the application for development; or
(2) A memorializing resolution adopted at a meeting held not later than 45 days after the date of the meeting at which *118 the municipal agency voted to grant or deny approval.... If the municipal agency fails to adopt a resolution or memorializing resolution as hereinabove specified, any interested party may apply to the Superior Court in a summary manner for an order compelling the municipal agency to reduce its findings and conclusions to writing within a stated time, and the cost of the application, including attorney's fees, shall be assessed against the municipality.
The statute requires a municipal agency to reduce each decision on any application to writing in the form of a resolution that includes findings of fact and conclusions of law. The resolution may be adopted at the time of the decision, at a meeting held within forty-five days of the decision, or in compliance with a court order compelling action within a specified time.
The Board resolution in this case fails to comply with the requirements of N.J.S.A. 40:55D-10(g) for several reasons. Most obviously, it is facially invalid because it is dated January 22, 2002 despite the fact that the Board did not vote on the application until February 26, 2002. The statute makes no provision for the adoption of a resolution before the municipal agency's decision.
Moreover, the resolution is substantively deficient. The factual findings set forth in a resolution cannot consist of a mere recital of testimony or conclusory statements couched in statutory language. Harrington Glen, Inc. v. Bd. of Adjustment of Leonia, 52 N.J. 22, 28, 243 A.2d 233 (1968); Loscalzo v. Pini, 228 N.J.Super. 291, 305, 549 A.2d 859 (App. Div.1988), certif. denied, 118 N.J. 216, 570 A.2d 972 (1989). Rather, the resolution must contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the applicant's variance request in accordance with the statute and in light of the municipality's master plan and zoning ordinances. Cf. Medici v. BPR Co., 107 N.J. 1, 23, 526 A.2d 109 (1987). Without such findings of fact and conclusions of law, the reviewing court has no way of knowing the basis for the board's decision. Morris Cty. Fair Hous. Council v. Boonton Tp., 228 N.J.Super. 635, 646, 550 A.2d 777 (Law Div.1988).
The Board's resolution in this case sets forth no factual findings. It merely identifies the applicant, describes the proposed site, summarizes, in a very cursory fashion, the testimony presented by Verizon's witnesses, and reiterates selected comments by Board members and the public. Its sole conclusory statement is couched in statutory language and lacks any reference to specific facts and circumstances surrounding the application. The Board itself admits candidly that the resolution states its conclusions in a "summary fashion." This is exactly the sort of resolution that has repeatedly been recognized as deficient by the courts. Medici, 107 N.J. at 23, 526 A.2d 109; Harrington Glen, 52 N.J. at 28, 243 A.2d 233; Smith v. Fair Haven Zoning Bd. of Adjustment, 335 N.J.Super. 111, 123, 761 A.2d 111 (App. Div.2000); Loscalzo, 228 N.J.Super. at 305, 549 A.2d 859; Morris Cty. Fair Hous. Council, 228 N.J.Super. at 646, 550 A.2d 777.
The Board's argument that various statements contained in the hearing transcripts should be incorporated into the resolution lacks merit. While remarks made by individual Board members during the course of hearings may be useful in interpreting ambiguous language in a resolution, they are not a substitute for the formality mandated by N.J.S.A. 40:55D-10(g). Such remarks at best reflect the beliefs of the speaker and cannot be assumed *119 to represent the findings of an entire Board. Moreover, because such remarks represent informal verbalizations of the speaker's transitory thoughts, they cannot be equated to deliberative findings of fact. It is the resolution, and not board members' deliberations, that provides the statutorily required findings of fact and conclusions. Scully-Bozarth Post #1817 v. Planning Bd. of Burlington, 362 N.J.Super. 296, 311-12, 827 A.2d 1129 (App.Div.), certif. denied, 178 N.J. 34, 834 A.2d 407 (2003).
The Board's contention that variance denials do not require detailed findings of fact is similarly unavailing. N.J.S.A. 40:55D-10(g) does not distinguish between application grants and denials. The statute directs boards to prepare a writing that includes findings of fact and conclusions of law for each decision on any application. This plain statutory requirement is recognized in Harrington Glen, where the Court found fault with a resolution denying a variance application. 52 N.J. at 27, 243 A.2d 233. The Court clearly explained:

Denial of a variance on a summary finding couched in the conclusionary language of the statute is not adequate. There must be a statement of the specific findings of fact on which the Board reached the conclusion that the statutory criteria for a variance were not satisfied. Unless such findings are recited, a reviewing court cannot determine fairly whether the Board acted properly and within the limits of its authority in refusing a variance.

[Id. at 28, 243 A.2d 233 (emphasis added).]
Regardless of whether the Board denied or approved Verizon's application, it was charged with satisfying the requirements of N.J.S.A. 40:55D-10(g). It failed to do so.
The necessity of a resolution that clearly states the reasons for a board's decision on a variance request is especially compelling in the context of a wireless communications site application. In cases in which the Supreme Court has reviewed decisions on such applications, it has closely examined and considered the factual findings and reasons set forth in the boards' memorializing resolutions. See, e.g., Cell South of N.J., Inc. v. Zoning Bd. of Adjustment, West Windsor, 172 N.J. 75, 82-91, 796 A.2d 247 (2002); Smart, 152 N.J. at 327-331, 704 A.2d 1271.
At a minimum, the legal insufficiency of the resolution in this case warrants a remand to the Board for reconsideration and specific factual findings. Smith, 335 N.J.Super. at 123, 761 A.2d 111. However, because the record clearly compels a reversal of the Board's action, a remand is not appropriate.

V
The Board argues that Verizon did not prove there is a significant gap in coverage because it failed to present evidence of the service available in the Township from other wireless communications carriers. It maintains that by failing to establish a significant overall gap, Verizon did not show that the proposed site is particularly suited to telecommunication uses.
When seeking a variance pursuant to N.J.S.A. 40:55D-70(d), an applicant must satisfy the statute's positive criteria by demonstrating a special reason to grant the variance. N.Y. SMSA Ltd. P'ship v. Bd. of Adjustment of Bernards, 324 N.J.Super. 149, 158, 734 A.2d 817 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999). It must also satisfy the statute's negative criteria by showing that a variance can be granted without substantial detriment to the public good and without *120 substantially impairing the intent and the purpose of the zone plan and zoning ordinance. Ibid.
The standard for establishing the positive criteria is dependent on the type of variance sought. Cell South, 172 N.J. at 83, 796 A.2d 247. In order to obtain a d(1) variance, a commercial applicant ordinarily must prove that its proposed use promotes the general welfare because the site is particularly suitable for the use. Smart, 152 N.J. at 323, 332, 704 A.2d 1271. When an applicant seeks to construct a wireless communications facility, the issuance of an FCC license will generally suffice to establish that the use serves the general welfare.[1]Id. at 336, 704 A.2d 1271. The applicant can prove particular suitability by demonstrating the need for a facility at the proposed location. New Brunswick Cellular v. Bd. of Adjustment of South Plainfield, 160 N.J. 1, 14, 733 A.2d 442 (1999); Ocean Cty. Cellular Tel. Co., 352 N.J.Super. at 523, 800 A.2d 891.
No case interpreting and applying New Jersey's MLUL has required a wireless communications carrier to prove the existence of a significant gap in coverage in order to satisfy the positive criteria of N.J.S.A. 40:55D-70(d). Although the existence of a coverage gap, i.e. a need for additional service, has been deemed relevant to an analysis of the positive criteria, see, e.g. New Brunswick Cellular, 160 N.J. at 14, 733 A.2d 442, New Jersey courts have not applied the rigorous standard developed by federal courts addressing alleged significant gaps in coverage under the TCA. Thus, the question of a significant coverage gap only arises when the carrier claims that the denial of its application constitutes an effective prohibition of wireless communications services in violation of the TCA, 47 U.S.C.A. § 332(c)(7)(B)(i)(II). For that reason, the Board's reliance on TCA cases such as Sprint Spectrum, L.P. v. Bor. of Upper Saddle River Zoning Bd. of Adjustment, 352 N.J.Super. 575, 801 A.2d 336 (App. Div.), certif. denied, 174 N.J. 543, 810 A.2d 63 (2002), and N.Y. SMSA Ltd. v. Tp. of Mendham Zoning Bd. of Adjustment, 366 N.J.Super. 141, 149, 840 A.2d 901 (App. Div.), certif. granted, 179 N.J. 273, 845 A.2d 1255 (2004), is mistaken.
In Ocean Cty. Cellular Tel. Co., 352 N.J.Super. at 524, 800 A.2d 891, this court declined to consider whether a local board's action violated the TCA until after it addressed the legality of the board's action under principles of traditional state land use law. We reasoned that "[t]his is the logical sequence, since ... the zoning board's decision process is governed by substantive state and local zoning laws." Ibid. We similarly refuse to consider TCA issues, including those relating to a significant coverage gap, until we determine whether the Board acted in accordance with traditional principles of the MLUL.
*121 Because the Board does not argue that the proposed site will negatively impact the community, its decision to deny Verizon's application is only sustainable if Verizon failed to satisfy the positive criteria for the grant of a use variance. Verizon holds an FCC license to provide wireless communications services in northern New Jersey. The question which remains is whether Verizon established that the proposed site is particularly suitable for this type of wireless communications facility.
Villecco was accepted by the Board as an expert in radio frequency engineering. He explained that service problems in the area were identified from drive-test data collected by Verizon engineers and dropped-call statistics compiled in the network operations center. Computerized signal propagation maps were prepared using a model employed by the telecommunications industry worldwide. Villecco used the propagation maps to show the Board where the coverage gap is located. He explained that the gap is caused by an over-abundance of signals that occur because of the area's proximity to Manhattan and the New Jersey Turnpike. He stated that the only way to solve the problem is to construct another wireless communications facility to act as a dominant server in the area.
Villecco identified the proposed site as the best location to establish a dominant server. He explained that this is a strategic location at the lip of a "canyon" through which JFK Boulevard descends into the Lincoln Tunnel. Antennas mounted on the apartment building roof could focus signals into the "canyon" without allowing signals to spill over into Manhattan. The building is also slightly higher than other apartment buildings in the neighborhood, which allows antennas to reach into all parts of the gap area. He said that a wireless communications facility at the proposed site would solve all of Verizon's coverage problems in the area for the foreseeable future. Villecco explained that existing structures in the B-1 and SW zones would not solve Verizon's coverage problem. He rejected a water tower at the western edge of the gap area as a potential site because of the interference problems it would cause in Manhattan.
As the judge found, Villecco's testimony was clear, cogent, and informative. The Board retained no expert of its own and heard no expert testimony that contradicted Villecco's opinions. Moreover, the Board made no finding that Villecco's testimony was unbelievable, incompetent, or conflicting. While a board may reject expert testimony, it may not do so unreasonably, based only upon bare allegations or unsubstantiated beliefs. Cell South of N.J., Inc. v. Zoning Bd. of Adjustment, West Windsor Tp., 172 N.J. at 87, 796 A.2d 247; Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. at 288, 212 A.2d 153.
The facts of this case are very similar to those presented in Ocean Cty. Cellular Tel. Co., 352 N.J.Super. at 519-20, 800 A.2d 891, where a local board denied a wireless communications carrier's application to locate twelve antennas on the roof of a multi-story building in a residential zone. In considering whether the applicant had satisfied the "particularly suited" standard, we noted that cases have previously found particular suitability when 1) the site is zoned for industrial use; 2) the site is centrally located in the carrier's search area; 3) the site already accommodates a monopole; 4) competent expert testimony establishes that existing capacity is inadequate; 5) propagation maps demonstrate an inadequacy of signal strength; 6) the site redresses a carrier's lack of capacity; or 7) viable alternate *122 sites are not available. Id. at 525, 800 A.2d 891 (citing AWACS, Inc. v. Clemonton Zoning Bd. of Adjustment, 160 N.J. 21, 25, 733 A.2d 453 (1999); New Brunswick Cellular, 160 N.J. at 14, 733 A.2d 442; and Smart, 152 N.J. at 332, 704 A.2d 1271). With these factors in mind, we found that the evidence, consisting of blocked call statistics and expert testimony, demonstrated that the proposed site was particularly suited for an antenna facility. Ocean Cty. Cellular Tel. Co., 352 N.J.Super. at 525, 800 A.2d 891. With regard to the expert testimony, we specifically noted that "[n]o competing evidence, expert or otherwise, was presented by any interested party or the Board to counter [the applicant's expert] testimony." Id. at 526, 800 A.2d 891.
Another case factually similar to the matter before us is Sprint Spectrum, L.P. v. Zoning Bd. of Adjustment of Leonia, 360 N.J.Super. at 376, 823 A.2d 87 (App. Div.2003), where a wireless communications carrier was denied a use variance to install nine antennas on the roof of a five-story apartment building in a residential zone. After reviewing the analyses applied in Smart, New Brunswick Cellular, AWACS, and Ocean Cty. Cellular, we concluded that the board's finding of no particular suitability was not reasonably supported by the evidence. Sprint Spectrum, 360 N.J.Super. at 386-89, 823 A.2d 87. We stated that the carrier demonstrated the existence of a coverage gap through drive test data and propagation maps, which were "accurate and accepted in the industry." Id. at 389, 823 A.2d 87. We further observed that placing the facility on the proposed site would solve the coverage problem. Ibid. Given the undisputed evidence that no satisfactory alternate site was available, we concluded that the carrier had satisfied the positive criteria. Id. at 391, 823 A.2d 87.
In Nextel of N.Y., Inc. v. Bor. of Englewood Cliffs Bd. of Adjustment, 361 N.J.Super. 22, 27, 824 A.2d 198 (App.Div. 2003), we upheld a local board's denial of a d(2) use variance to install telecommunication antennas on the roofs of two multi-story office buildings. In so doing, we agreed with the board's finding that the applicant had failed to establish the positive criteria required by statute. Id. at 45, 824 A.2d 198. In Nextel, however, the board had specifically found the testimony of the applicant's expert "not convincing," "conflicting," and "sometimes not believable." Id. at 34, 824 A.2d 198. In reviewing the record, we agreed. Id. at 42-43, 824 A.2d 198. We observed that the expert offered no specific information regarding the nature of the gap, presented no analysis based on factual data, and avoided questions regarding alternate antenna placement.
In the case before us, Villecco presented propagation maps based on computer models accepted in the industry, described in detail the technical causes of the service gap, explained why the proposed site would solve the coverage problem, and readily answered the Board's questions about alternative sites. Thus, while it might have been reasonable for the local board to reject the expert's testimony in Nextel, id. at 41, 824 A.2d 198, it was not reasonable for the Board to reject Villecco's testimony summarily and without articulation in this case.
Under the standards for particular suitability applied in Ocean Cty. Cellular and Sprint Spectrum, Verizon clearly proved that the proposed site is particularly suited to telecommunications use. Using propagation maps and expert testimony, it established a need for an additional wireless communications facility and demonstrated that the proposed site is located so as to redress the coverage problem. It also *123 showed that no technically comparable alternate sites are available. We find it unreasonable for the Board to have concluded that Verizon failed to satisfy the particular suitability test.
Because Verizon is an FCC-licensed wireless communications carrier and because it established the particular suitability of its proposed site, it satisfied the positive criteria of N.J.S.A. 40:55D-70(d). The Board made no finding of negative factors nor does it argue before us that negative factors create a substantial detriment to the public good. Under these circumstances, the Board's denial of Verizon's application for a d(1) use variance was arbitrary, capricious, and unreasonable.

VI
As a final point the Board contends that the testimony of Verizon's radio frequency engineering expert was an impermissible net opinion. The Board did not raise this issue in the Law Division. Moreover, it made no factual findings concerning the credibility or quality of Villecco's testimony. Thus, it is in effect now arguing that it erred in accepting the maps and testimony into evidence. We decline to consider issues not properly presented at the hearing or trial level, save in exceptional circumstances. Nieder v. Royal Indem. Ins. Co, 62 N.J. 229, 234, 300 A.2d 142 (1973). None are here present. In any event, the point is clearly without merit and does not require discussion in a written opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Arguably, an applicant seeking to develop a communications facility that does not require the construction of a tower or monopole need show nothing besides its FCC license in order to satisfy the positive criteria. See Smart, 152 N.J. at 336, 704 A.2d 1271 (holding that FCC-licensed applicant must prove particular suitability if facility requires construction of a tower); Ocean Cty. Cellular Tel. Co. v. Tp. of Lakewood Bd. of Adjustment, 352 N.J.Super. 514, 522 n. 1, 800 A.2d 891 (App.Div.) (noting that Supreme Court expressly declined to decide whether communications facilities that do not require a tower are inherently beneficial uses that presumptively satisfy positive criteria), certif. denied, 175 N.J. 75, 812 A.2d 1108 (2002). However, that specific issue has yet to be decided. See Sprint Spectrum, L.P. v. Zoning Bd. of Adjustment of Leonia, 360 N.J.Super. 373, 386, 823 A.2d 87 (App.Div. 2003) (declining to decide whether communications facilities that do not require a monopole are inherently beneficial uses).