956 A.2d 349 (2008)
403 N.J. Super. 1
DOWEL ASSOCIATES, Plaintiff-Respondent,
v.
HARMONY TOWNSHIP LAND USE BOARD, Defendant-Appellant, and
Township of Harmony, Defendant, and
Phillipsburg Riverview Organization, Defendant/Intervenor-Respondent.
Dowel Associates, Plaintiff-Respondent,
v.
Harmony Township Land Use Board and Township of Harmony, Defendants, and
Phillipsburg Riverview Organization, Defendant/Intervenor-Appellant.
Docket Nos. A-5564-06T3, A-5650-06T3.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 2008.
Decided September 9, 2008.
*351 Kevin P. Benbrook, Clinton, argued the cause for appellant Harmony Township Land Use Board in A-5564-06T3 (Benbrook & Benbrook, attorneys; Mr. Benbrook, on the brief).
Richard Webster, argued the cause for intervenor/appellant Phillipsburg Riverview Organization in A-5650-06T3 (Eastern Environmental Law Center, attorneys; Mr. Webster and Kathleen Jackson-Shrekgast, on the brief).
Guliet D. Hirsch, Flemington, argued the cause for respondent Dowel Associates in both appeals (Archer & Greiner, attorneys; Ms. Hirsch, on the brief).
Before Judges STERN, COLLESTER and C.L. MINIMAN.
The opinion of the court was delivered by STERN, P.J.A.D.
The Harmony Township Land Use Board (Board) and Phillipsburg Riverview Organization (PRO) appeal from an order of the Law Division entered on May 21, 2007, which "reversed" the February 2005 resolution of the Board denying plaintiff's application for preliminary major subdivision approval to permit development of a residential project known as River Walk (or Riverwalk) on plaintiff's 185.227 acre parcel. The Law Division "remanded" the matter to the Board for entry of an order granting plaintiff "conditional subdivision approval" within sixty days if its "revised Storm[-]water Management Plan ... corrects the technical deficiencies identified in the report of the court-appointed Storm[-]Water Management expert," or, alternatively, plaintiff "secure[d] a waiver" from the New Jersey Department of Environmental Protection (DEP) regarding "the infiltration requirements" of the DEP's Storm-water Management Rules, N.J.A.C. 7:8-1 et seq.[1] The order also permitted the Board to "condition its preliminary major subdivision approval upon issuance of a New Jersey Pollution Discharge Elimination System Permit" ("NJPDES") by the DEP.[2]
Appellants contend that the Board's denial of the application was supported by the record and that the trial court erred in reversing that denial.[3] PRO further contends *352 that the trial court erred in concluding that the Board should have delegated to the DEP the determination regarding "feasibility" of the proposed on-site sewage disposal system, and that "feasibility" is uniquely a matter of local decision making. PRO further asserts that affordable housing issues should have been referred to the Council on Affordable Housing (COAH), not the DEP.
We affirm the judgment.

I.
In February 1990, plaintiff and Harmony Township entered into a "settlement agreement and stipulation of dismissal" of plaintiff's litigation which had contested Harmony Township's "housing element and fair share plan." The agreement followed mediation with COAH under the Fair Housing Act (FHA), and was filed in support of the municipality's petition to COAH for substantive certification. Pursuant to the settlement agreement, the Township agreed to rezone plaintiff's property to permit the development of an inclusionary project on the terms and conditions set forth in the agreement, which project would "completely satisfy the Township's [then-]current Mount Laurel housing obligation determined by COAH." The agreement set forth the details of the anticipated inclusionary project, and provided that the Township "agrees that Dowel's applications for development will be expeditiously considered by the Harmony Township Planning Board, and that the time constraints and deadlines imposed by the Municipal Land Use Law [MLUL], N.J.S.A. 40:55D-1, et seq., will be adhered to, except as provided in the Affordable Housing Ordinance." To that end, plaintiff also agreed to timely respond to all requests for additional information made by Planning Board members or professional staff to facilitate that review. The agreement further specified that "[n]otwithstanding anything herein to the contrary, the Harmony Township Planning Board retains all lawful authority to consider and act upon all applications for development made to it by Dowel, and to exercise its judgment and discretion as provided under the [MLUL]."
The settlement agreement also included a recognition by both parties that "inadequate sewer treatment capacity exists in the Township to service the Project." The agreement outlined a preferred plan for an off-site waste treatment plant, the cooperative efforts expected from plaintiff and the Township to pursue that plan, and the cooperation expected for considering "another specific alternative" to provide adequate sewer capacity to the project. Those efforts included the Township's agreement "to seek an amendment of the municipal Wastewater Management Plan (WMP) to reflect" the planned off-site wastewater treatment plant. The Township also agreed "to diligently prosecute any action in condemnation or amendment to the WMP, or both if required." Plaintiff agreed to assume all the costs and expenses associated with any amendment of the WMP necessary for the project. As set forth in the agreement, the agreement was filed with the Warren County Clerk for recording.
The project did not proceed for about ten years because of concern about sludge operations on neighboring property. Upon resolution of that problem, on June 1, 2000, the township petitioned COAH for substantive certification, and COAH granted second round substantive certification to Harmony Township on October 2, 2002. *353 The resolution granting substantive certification expressly noted that an on-site sewage treatment plant had been included in the Township's wastewater management plan (which had been amended pursuant to the settlement), which was not expected to be built "unless and until Dowel was ready to construct its development and at Dowel's expense." The resolution did not mention anything more about the nature of the proposed on-site sewage treatment except that "the site has access to appropriate water and sewer infrastructure" consistent with DEP standards and that "Dowel Associates has awarded contracts for the site development and for the on[-]site sewer[-]treatment plant."
The MLUL provides, in part, that "[t]he governing body may by ordinance require approval of subdivision plats by resolution of the planning board as a condition for the filing of such plats with the county recording officer[.]" N.J.S.A. 40:55D-37(a). Pursuant to that authority, Harmony Township has enacted an ordinance, Chapter 148 of the Code of the Township of Harmony, entitled "Subdivision of Land."
The MLUL further provides:
An ordinance requiring approval by the planning board of either subdivisions or site plans, or both, shall include the following:
. . . .
b. Provisions ensuring:
. . . .
(3) Adequate water supply, drainage, shade trees, sewerage facilities and other utilities necessary for essential services to residents and occupants[.]
[N.J.S.A. 40:55D-38.]
Pursuant to that authority, section 148-12A of the Harmony Township municipal code lists numerous requirements for plats for minor subdivisions, which the ordinance incorporates by reference to establish the same requirements for major subdivisions. Those requirements include:
(15) Documentation of feasibility of an adequate method of sewage disposal.
For preliminary subdivision approval applications, section 148-13 requires the following additional preliminary plat information:
(5) Proposed sanitary sewer system, in plan and profile.
(a) All proposed sanitary sewers with sizes and gradients.
(b) All proposed pumping stations, force mains and other special facilities.
(c) An engineer's report in compliance with the requirements of the [DEP].
(d) If the site is to be served by an individual sewage disposal system, a copy of the report required for percolation or permeability tests and soil logs therefor shall be submitted. [Added 5-3-1988 by Ord. No. 0:88-6; amended 9-4-1990 by Ord. No. 0:90-16]
A separate section, 148-14, setting forth requirements for "improvement and utility plans" requires additional data concerning:
H. Sanitary waste disposal system.
. . . .
(3) If on-site disposal is proposed, typical lot layout, indicating location of system with reference to house and water supply; and detailed drawing of proposed sanitary waste disposal facility.
Section 148-21, dealing with utilities, further requires that each proposed lot
shall be proposed to be served by public water supply and sewerage disposal systems or alternate capable of meeting all local, county and state specifications and standards; provided, however, that securance of necessary permits, approvals and/or clearances shall be the responsibility *354 of the developer, and subdivision approval shall convey the approval regarding utility systems proposed by the developer. Lack of such approval may, however, be grounds for disapproval of the application.
Article VI of the Township Code deals with "Environmental Impact Statements" (EIS). Section 148-30 requires applicants to file an EIS for all preliminary major subdivisions, and section 148-33 contains the required "contents" for each EIS. Section 148-33 of the ordinance further provides:
G. Disposition by the Board. The Board shall review the information furnished in the environmental impact statement in the context of the overall design of the proposed development and the relationship of the proposed development to the environment. The information is to be used solely to help ensure that the proposed development will cause no reasonably avoidable damage to any environmental resource.
Finally, section 148-35 contains the Board's standards for reviewing the EIS, and states that the Board
shall take into consideration the effect of the proposed project upon all aspects of the environment, including but not limited to sewage disposal, water quality, water supply, preservation of trees and vegetation, protection of water courses, protection of air resources, protection of aquifers, protection of public lands and their uses and ecosystems and the creation of any nuisance factors.... The Planning Board shall reject the proposed project of the environmental basis [sic] only if it determines that the proposed project will result in appreciable harm to the natural environment, has not been designed with a view toward the protection of natural resources, will place an excessive demand upon the total resources available for such project and for any future projects or will result in reasonably avoidable damage to any environmental resource.
Within that legal context, the Board had authority and was authorized to consider Centex's proposal to develop plaintiff's property. Centex filed its application seeking preliminary major subdivision approval to construct the River Walk project on plaintiff's property in March 2003. The Board held hearings on the application at the Board's regular monthly meetings on seventeen dates from August 21, 2003, through December 16, 2004.
As the appeal before us focuses primarily on the feasibility of the on-site sewage disposal system and stormwater management issues, we develop the record concerning those subjects. The proposed development was to consist of "136 Estate homes, 137 Patio homes [smaller single-family homes], and 42 Village Green units," which consist of 21 duplexes. The Village Green units are divided into 36 units which are low income, nine of which are senior citizens, and there are also six senior citizen market units within the Patio homes area.
During the Board's hearings, Centex presented testimony of fourteen witnesses, including several professional engineers including Raymond J. Tully from Melick-Tully and Associates (Melick-Tully) and several from the Schoor DePalma Engineers and Consultants (Schoor DePalma).
Melick-Tully had prepared a subsurface investigation and geologic evaluation report, dated February 28, 2003, designed to meet the geologic evaluation requirements of Harmony Township's ordinance. The report described the geologic formations present, including a "large thrust fault through the lowest part of the site separating two blocks of folded Kittatinny rock." *355 The report discussed both "Pseudokarst Features" and "Karst Activity," the latter including five sinkholes, and seven voids and/or soil-filled cavities in the rock, found in investigatory probes. It set forth several conclusions and recommendations, including the following:
2) The entire site is underlain by carbonate rock fractures which are susceptible to solutioning. Remedial work will be required to correct existing sinkholes, and the correction of sinkholes as they occur during construction will be necessary. An area of the site which we believe is more susceptible to future sinkhole formation is generally located in the north central portion of the site, an area where some solutioning, soft soils, and excessive grout have been observed. A suitable proactive measure in this area would include the use of deep dynamic compaction to densify zones of loose soils, or collapse small voids where they exist. In other areas of the site, especially where existing sinkholes are present, grouting may be required should sinkholes recur.
Under the heading "Site Design Criteria  Limestone Areas," the Melick-Tully report explained:
Changes in the surface runoff patterns that allow water to migrate to the subsurface are the most frequent causes of sinkhole development during and following construction. The site design details should do everything possible to minimize discharge of water into the subsurface. While no amount of engineering or remedial earthwork can guarantee that sinkholes will not develop in areas of carbonate geology, careful site planning and construction can minimize the potential for their development.
The report therefore recommended that storm drain pipes include "water-tight gaskets to prevent leakage," and roof drains should pipe water away from the proposed structures, either directly to the storm drainage system in sealed pipes or to a swale. Ponding was to be avoided during construction, and the report suggested that "the storm[-]water detention basin should be lined with at least twelve inches of compacted silty/clayey soils to prevent recharge to the subsurface." The report also recommended "a program of dynamic compaction prior to construction" in the "area of concern related to future sinkhole development."
In his October 2003 testimony, Raymond Tully, President of Melick-Tully, explained that the subject property was "not a perfect site, but by no means is it an awful site." He thought it could be developed "provided that prudent means are used." He noted that Melick-Tully's work assignment was to assess the site relative to the improvements "exclusive of the waste water treatment plant" and its related land area because Schoor DePalma was designing that plant and was to prepare a report regarding that subject. Having reviewed Schoor DePalma's work, Tully concluded that Schoor DePalma "did a pretty extensive investigation there and didn't report any significant problems in the explorations. That being the case I think you can build what they're proposing to build." Later in his testimony, Tully reinforced that view: "It's nothing that's extraordinary. This is pretty typical for areas underlain by carbonate rock, and there are sites that are significantly worse than this. But it just indicates that there is, you know, you've got to be careful, you've got to implement these design recommendations."
Tully described the means by which he thought a significant sinkhole he described *356 could be remediated, and added that it was not so bad that it was in the basin area, because the excavation would expose the area and the issue could be addressed. If the hole were filled with grout and a double liner installed in the basin, Tully considered it "extremely unlikely," but not impossible, that a sinkhole problem would remain at that point. He agreed that, until a spot is fixed and a liner installed, water can get in the subsurface and another sinkhole could form next to it, "[a]nd water's the mechanism that triggers it." The sinkholes develop where there is "a lot of water over a short period of time usually that concentrates in one particular area," and often that occurs during construction, when the problem can be seen and fixed.
An earlier engineering geologic evaluation report was prepared for plaintiff on July 8, 1993, by Joseph A. Fischer of Geoscience Services. That report concluded, among other things, that "the rocks underlying the site are solutioned, with both open and soil-filled cavities. Sinkholes can occur during construction, and to some extent, during the life of the project." The report also warned of "[a]ccelerated movement of contaminated fluids in fractures and cavities" and the "possibility of large sinkholes in areas of deeper rock." Recognizing the plan at the time to preserve some of the site for farmland, the report added: "From a geotechnical standpoint, it appears most viable to utilize the most intensely folded area of Segment 3 for the area set aside for farming.... It is [] this zone that we perceive has the greatest risk of the formation of larger-sized sinkholes in the future." The report included a listing of "zones of weakness" and construction procedures were recommended to limit all manner of leakage that could create new sinkholes.
Schoor DePalma prepared a "Supplemental Geotechnical Engineering Study," for Centex, dated October 6, 2003, to supplement the Melick-Tully and Geosciences reports and to incorporate discussion of the proposed sewage treatment disposal system. As described by Schoor DePalma, the subsurface effluent disposal system would be "composed of four (4) individual zones, functioning simultaneously or independent of each other and a wastewater treatment building." Each of the four zones would include "drip lines" buried about four feet below the surface. The sewage would be treated using an "advanced biological-membrane filtration system" so that the effluent would be of a quality "close to being potable" so that the native soil would not be needed to further enhance treatment, but rather would serve only as a hydraulic transport system.
During a "site walkover" of the area proposed for the treated effluent disposal field, Schoor DePalma engineers observed "no karst[-]related sinkholes, outcrops, drainage pathways into the ground, or land surface mottling." Noting the other geotechnical reports of limestone bedrock on the site, the Schoor DePalma report stated:
However, based on our subsurface exploration within the proposed effluent disposal field area, this area is underlain by [a] thick layer of residual soil and no enhanced weathered zones were encountered or observed during the field operation. This means that after [a] thousand years of rainfall on this part of the site, no Karst[-]related problems were encountered[.]
The report added that, in view of those observations, "the proposed site is suitable for the proposed effluent disposal system and is less prone to karst development than the rest of the site. The subsurface *357 soils have adequate permeability for the purpose of recharging water."
Schoor DePalma agreed with Melick-Tully's recommendations to remediate sinkholes and to line the planned basins in the proposed stormwater detention basin area. The Schoor DePalma report detailed its findings and recommendations, and stated:
should a sinkhole be formed within the effluent disposal field during the lifetime of the system, it can be easily fixed without any adverse affect [sic] on the system function. The system is divided into four (4) zones, with each zone capable of handling nearly 1/3 of the average daily flow. Therefore shutting down a zone, in the remote possibility that a sinkhole forms in the area, would not in any way affect the system performance as maintenance and repairs can be made while the system is still operating or during conditions of low-use [sic] such as during the late evening/early morning hours.
The report concluded:
We are of the opinion that the project site is suitable for the construction of the Groundwater Discharge System and will not adversely impact the present condition of the site due to the following reasons:
 The proposed effluent disposal field is located in an area that is geologically suitable for this application.
 The treated effluent disposal field site, in general, is underlain by thick residual soils, which were relatively consistent in density or stiffness. Therefore, the site has a low potential for sinkhole development.
 During our subsurface exploration, no enhanced weathered zones or voids were encountered within this area.
 No sensitive structures are supported in the vicinity of the field.
 The treated effluent disposal system functions similar to the septic system with exception that the water is treated prior to being discharged to the ground.
 The proposed discharge system consists of four (4) individual zones, functioning simultaneously or independent[ly] of each other. In case of remote potential formation of a sinkhole within any of the zones during the lifetime of the system, a zone can be shut and the depression be remediated without having any impact on the system function.
Testifying for Schoor DePalma, Moustafa A. Gouda stressed that if a sinkhole developed in the disposal area, which he viewed as a "remote possibility," the disposal system could work effectively with just three of the four zones operating, and the sinkhole repair could be completed within twenty-four hours. A Schoor DePalma project manager, David Indonato, further explained that the system would have a "remote dialing system" that instantaneously would reflect if the system experienced a break. Also a drip system would use flexible piping so if a depression formed underneath the piping it would not affect the system's operations.
Harmony Township retained its own expert, Leggette, Brashears & Graham (Leggette), to analyze hydro-geologic issues regarding the site. Frank Getchell of Leggette submitted a report dated September 16, 2004, in which  after reviewing the Schoor DePalma and Melick-Tully reports and other documents and viewing the property and neighboring Garrison property  he concluded that Centex had to consider additional subjects before the Board made its decision. They included (1) consideration of the effect of a major *358 centrally located depression in the bedrock, in the vicinity of the planned stormwater detention and wastewater disposal sites; (2) explanation of the effect of the storm-water routing on the neighboring Garrison property; (3) the new DEP storm-water regulations and their recommendations for groundwater recharge. The report noted that further study needed to resolve the "contradictory" conclusions in the Schoor DePalma report and one prepared by HydroQual about the subsurface movement of water, with Schoor DePalma having reported movement "to the south" and HydroQual having reported movement "to the west."
The record also contains letters from the DEP relating to the subject property. First, the DEP's Division of Water Quality, Bureau of Nonpoint Pollution Control, sent Centex a letter on May 18, 2004, entitled "NJPDES[4] Permit Application Request for Additional Technical Information" which indicated that the "discharge to ground water (NJPDES-DGW) permit application" was administratively deficient, and outlines additional information needed before the application review can proceed. The DEP added that it "cannot issue a final NJPDES-DGW permit until a determination to amend the WQMP [water quality management plan] has been adopted."
The DEP's Division of Watershed Management also sent a letter dated June 16, 2004, stating that it had completed its review of Harmony Township's December 4, 2003 proposed amendment to its wastewater management plan, and "determined that the submittal was substantively deficient." The letter set forth fifty-two numbered issues or concerns that should be addressed in any subsequent resubmission. Among other things, the letter stated that the "Department will not approve the WMP from the Township until the specific site plan for this tract has been submitted for review." The DEP also required submission of "a planning summary regarding the impacts of limestone within the Township and detail [as to] how the WMP proposal will address this issue."
The Bureau of Nonpoint Pollution Control sent another letter on August 13, 2004, regarding the NJPDES permit application, setting forth additional testing information that was needed, and adding that, "[b]ased on limestone pinnacles present" in the disposal area, Centex should "provide secondary porosity data of the underlying bedrock to determine the extent of any such formations within the area of disposal." The DEP further advised Centex "that the presence of limestone within the area of disposal may require alternate discharge limitations for pH to ensure the structural integrity of the formation is not adversely affected by the interaction of wastewater and limestone."
At the December 16, 2004, hearing before the Planning Board, Douglas Mace, the Board's engineer, expressed concern about the storm-water plan because he understood the DEP regulations to prefer addressing stormwater using "a non-structural manner" if possible, but the applicant proposed using structures to carry off the storm-water, so the regulations would require justification for that approach. Mace was troubled by the inconsistency of concluding that structures were needed to deal with forty-five inches of storm-water at the same time that the applicant was asserting that the land could safely accommodate *359 300 inches of drip irrigation from the wastewater treatment.
Mace further opined that "the extent of the sinkholes in this property still remains a serious concern," although he noted that Tully had provided good information and "good methodology of repairing standard sinkholes." Mace also noted that he and the Board's geologist, Frank Getchell, had examined the property in mid-November 2004 after the corn crop was harvested and "in a relatively short time ... found a whole line of sinkholes running parallel to Garrison Road that had formed either over the summer, or at least ... since the crop had been planted." Mace considered those sinkholes "kind of were a red flag," especially because three of them were in a cluster that, based upon his experience, were likely to develop and join together to create one large sinkhole. Mace thought the Board might want to require "some additional remedial techniques" for the situation, adding: "I don't see the sinkhole issue [as] closed." Mace also added that, if the Board was considering a conditional approval, it should set out the policies in the resolution, so that Mace could administer Board-established policy decisions.
Getchell also spoke at the hearing, and agreed with Mace's views on the geology issues. He noted that the site's geologic complexity had become more apparent as the applicant had supplied more specific information during the hearings. He was concerned about issues he saw "with the karst" given the "very concentrated" development planned for the site. Responding to the assurance that if one disposal bed cell failed "because a karst[-]related feature develops under it, we still have, say, the other three," Getchell noted that because of the way the sinkholes were presently developing "[i]t could actually develop in the center of the field, and now all of a sudden all the cells are taken out." Getchell confirmed Mace's observation about the sinkholes they saw in November, including that the three were likely to "coalesce and become one," adding that "you can see there are fractures radiating out even further" making it likely that the coalesced sinkhole would "become even larger." Getchell noted that the two documents received from the DEP regarding the site had both raised questions about the "pinnacle nature of the bedrock, the karst activity" and the likely influence of the bedrock's porosity.
Regarding the stormwater approach, Getchell raised additional "concern" about the effectiveness of piping away stormwater given the karst conditions that could damage the pipe. He was also "concerned" about elevated nitrates in the area, which perhaps would be flowing off the site when the 300 inches of treated wastewater were released into the ground, even though the wastewater itself would not have excessive nitrates upon discharge. He further noted concern that this could affect the private well water relied upon by the neighboring properties. Getchell opined that he "would like to see more attention given to maybe being more diffuse with the disposal of water, with storm[-]water, with wastewater, maybe even using wastewater as on-site beneficial re-use for irrigation purposes." Getchell also noted that sinkholes were already developed on the area proposed for the lined stormwater detention basin, and with the likelihood of additional sinkholes developing, believed that could compromise the integrity of the basin liner. He also felt that someone would have to monitor that problem and "respond appropriately and in a timely fashion." Getchell additionally stated that the area of the property that was the "most traumatic," or most likely to develop karst features, "would be right now where the wastewater disposal is." In sum, he stated his "concern in regard to *360 karst and the existing features regarding the potential for future features," although "you can engineer a remediation for any of these features if you have the money."
After discussion, the Board unanimously voted to deny the application. The resolution contained findings relating to the sewage disposal issue. Under the heading "Site Suitability," the Board wrote:
It has not been demonstrated to the satisfaction of the Land Use Board and its professionals that the project, as and where proposed, which is upon a site underlain by limestone formations with a significant history of subsidence (sinkhole) activities, faults and other forms of unstable conditions, will not put the Township and the future residents of this site at risk with respect to the negative consequences of such development of such a critical site. In the October 20, 2004 report of Schoor DePalma (page 2), engineer Gouda acknowledges that: ... any infiltration (of storm[-]water or treated sewer effluent) in a high risk area, even that occurring in an undeveloped pristine meadow, could cause sinkholes, leading the Land Use Board to the inescapable conclusion that the applicant's own professionals acknowledge the site to be somewhat of a high[-]risk area with respect to subsurface stability.
[(emphasis added.)]
In the section labeled "Subsurface Geology," the Board further addressed the susceptibility of the area to sinkhole development:
Additionally, there appears to be a major fault line underlying the tract in an area immediately adjacent to the proposed sewage treatment facilities with its attendant Discharge to Groundwater (DGW) (drip irrigation) system with an attendant potential for increase[d] sinkhole activity in an area of the site that... is critical to the functioning of the site as a residential community of significant size. Although the applicant's hydro-geological consultant, Raymond Tully, has characterized the risk attending sinkholes, subsidence and other such activities as relatively small, this risk was not quantified nor given an order of magnitude upon which the Land Use Board could make an informed evaluation and prediction as to degree of risk.
[(emphasis added.)]
The Board further referenced the
1993 Geoscience Report (prepared by Dr. Joseph Fischer) which conflicts, markedly, with the latest reports of the applicant's engineering consultants, Schoor DePalma, by acknowledging that:
The geotechnical interpretation of the site subsurface conditions is made even more equivocal by the post-depositional solutioning of the carbonate rocks and glacial-aged loading and sediment deposition. (Page 2)
An open sinkhole is located near TP-6 in Segment 3. The sink was reported to be sizeable enough at one time to contain a large truck trailer.
Both reports from local farmers and the evidence of TP-6 indicate that several attempts have been made to fill the sinkhole which was still some 10 feet in diameter at the time of our field investigations, and that it was likely larger than it is. (Page 4: Segment 3)
Other suspicious, large depressions can be found within the wooded area, along the southeasterly and southwesterly property lines. (Page 5: Segment 4)... rock in this tightly folded area was highly stressed, probably sheared in numerous portions and likely more susceptible to solutioning.... (Page 6: Segment 3)
*361 The section of the resolution captioned "On-Site Sewage Treatment" noted that the original affordable housing litigation settlement anticipated a regionalized central sewage facility, discharging into the Delaware River. The Board found that the current proposal for a discharge to groundwater drip irrigation system "will provide an extremely high concentration of effluent being discharged into an area underlain with limestone which has been clearly demonstrated to be prone to solution cavities, as evidence[d] by sinkholes and the on-site test pits, test probes and test borings," which "creates, in the Land Use Board's view, a significant potential for disturbance of the subsurface geological equilibrium." The Board noted that the applicant's own professional considered the proposal "an unproven technology, i.e. there is no documentation that a system of this size has been designed, built and placed in service for residential projects in an area underlain by limestone with significant documented solutioning." (Emphasis added.) Accordingly, the Board considered this project as "tantamount to a pilot program which the Board believes to be imprudent in general and, in particular, unapprovable for this particular site, given its Karst geology, at least absent a more convincing demonstration of feasibility without significant adverse impacts." (Emphasis added.)
The Board also noted that there appeared to be conflicts between "the Melick Tully soils probes results and conclusions" and the conclusions of Schoor DePalma and the Geosciences (Joseph Fischer) report.
Finally, the Board stressed that the area normally received about fifteen inches of rainfall infiltration annually, but that the proposed sewage treatment system would cause 300 inches of treated effluent to infiltrate the groundwater annually, an increase of about twenty times the usual amount. The Board concluded:
This massive introduction of treated effluent... into an area underlain by limestone formations subject to solutioning has not been demonstrated to be a safe and prudent methodology or one without potential for adverse impacts. Although the applicant's consultants have explained the presence of monitoring and fail[-]safe systems within the operations of the bed that would detect a break in[] the distribution lines caused by a subsurface collapse, they have not provided any fail safe should the subsidence occur at one or more of the four (4) conterminous sections at any one time.
Finally, under the heading of "storm[-]water management," the resolution stated:
The applicant has failed to demonstrate that the proposed methodology of storm [-]water management (collection, treatment and discharge) complies with the Best Management Practices (BMP) Manual developed by the New Jersey Department of Environmental Protection (NJDEP). Compliance with the BMP Manual may or may not be possible but the applicant has failed to demonstrate impossibility of full, or even partial, compliance, given the limestone subsurface geology. That is, it is a primary goal of the Best Management Practices (BMP's) to infiltrate, rather that discharge off site, the storm[-]waters generated from the project, whereas it is the general goal of a project underlain by Karst geology to prevent infiltration of storm[-]waters, which can then add to the solutioning of susceptible limestone subsurface geology. Even given the apparent conflict between the BMP's (infiltration as a primary goal) and the precautionary measures which *362 should be taken with respect to storm[-]water detention basins in limestone areas (preventing infiltration), the applicant has still failed to demonstrate that it has attempted to reconcile the two (2) conflicting interests and provide the best compromise methodology of structural and non-structural storm-water management. With respect to the discharge of the storm[-]waters generated on the site and collected in the basin system, the applicant has clearly demonstrated that the rate of run[-]off will be substantially less on a post-development basis than it is on a pre-development basis. However, although the rate of run[-]off (in terms of cubic feet per second) will be substantially lower, the duration of that runoff will be very significantly higher. That is, waters which ran through the existing drainage patterns (the swale traversing the Garrison farm located opposite (northerly) the River Walk site) which ran, for example, for a matter of hours after a "typical" storm will now run for days. The applicant has not demonstrated to the Board's satisfaction that no adverse consequences to all the downstream property owners (including the Garrisons) will result from this significant alternation of storm[-]water flow duration.

II.
On November 7, 2005, Judge Victor Ashrafi entered two orders appointing experts to advise the court on the issues before it. In the "Consent Order appointing storm[-]water management expert," the judge appointed James F. Cosgrove, Jr., of TRC Omni Environmental Corporation, to "advise the court concerning storm[-]water management related issues." In the other order Matthew J. Mulhall and Edward L. Balsavage were appointed as hydro-geological experts. In 2006, those experts each issued reports.
Mulhall and Balsavage both reported on the feasibility of the on-site sewage disposal system. Mulhall stated that "[b]ased on the work of Melick-Tully and excluding the proposed wastewater treatment and disposal operations, the site is suitable for the development of the planned homes and related infrastructure[.]" Because the site was prone to develop sinkholes, Mulhall thought that the most conservative approach for addressing waste disposal would be an off-site facility, but he noted, without further explanation, that "[a]pparently, an off-site wastewater treatment facility is not an option for the Centex project."
Mulhall criticized Schoor DePalma's investigatory approach for analyzing only shallow features, when it should have evaluated to "at least 20 feet below the top of the water table" because "[d]eeper solution cavities and bedrock fractures can become a depositories [sic] or conduits for soils eroded from shallower depths. It is not until the water-table surface is encountered that water velocities are reduced to predictable and safe rates to limit subsurface erosion in carbonate rock environments." Mulhall noted that the Melick-Tully report found "highly fractured and weathered" carbonate rock at depths greater than fifty feet below ground surface, which conditions "should be of concern to anyone planning to discharge 100,000 gallons of water per day into a carbonate rock environment." In Mulhall's view, the entire depth of the unsaturated zone beneath the drip irrigation system should have been evaluated to determine if solution cavities were present, and to determine whether the proposed volume of effluent could be discharged without resulting in adverse impacts to the aquifer, storm-water basin 2, or nearby homes, or in case of catastrophic *363 failure of the wastewater system. Mulhall further concluded that Schoor DePalma failed to develop remediation plans to address sinkholes when they form, and contingency plans for wastewater disposal if one or more of the disposal system's zones could not be used.
In sum, Mulhall concluded that
[w]hile the site was suitable for development of houses, roadways, utilities, and stormwater management controls, based on the data collected by Schoor DePalma it cannot be concluded that the site is suitable for the disposal of treated wastewater. It is possible that the site could be suitable for such a large daily discharge, however, a thorough and competent investigation of geologic and hydro[-]geologic conditions must be conducted before that conclusion can be made. Based on the data currently available, we must conclude that the site is not suitable.
Balsavage's report began by listing numerous sections of the Harmony Township land use ordinances and concluded that plaintiff and Centex had presented data to meet all of the requirements of those ordinances. He opined that "[t]he site [was] suitable for the proposed stormwater management system," which would improve the present conditions at the site, and would not result in a significant increase to the risk of sinkhole development nor a significant threat to the bedrock aquifer water quality. Balsavage further concluded that the site was "suitable for the wastewater disposal system based on the soil and hydro[-]geologic setting" because the discharge would occur in an area with a "substantial vertical thickness of unsaturated soil" which could accommodate the expected six-foot rise of the static groundwater surface directly beneath the discharge area. Balsavage added that there were "no void zones discovered in the soil mantle, which suggests that the risk of future sinkhole development due to void collapse from infiltrating water is low." Balsavage recommended that "[t]he Applicant should develop a Standard Operating Procedure that details how future sinkholes are assessed and repaired at the site and specifically the wastewater treatment area."
In his report, Cosgrove noted that in addition to the homes on the 185 acres, "the balance of the property [is] to be utilized for the storm-water management basin, a wastewater disposal field, and open space. Storm-water is proposed to be collected with swales, roadway inlets, and pipes that direct runoff to three large basins." He detailed the plans, governing regulations, and plan's proposed compliance. He concluded:
From an engineering standpoint, the storm[-]water management system is sound and effective. Aside from several minor technical discrepancies in the storm[-]water calculations, the storm[-]water management report was well done. The constructed wetland basins appear to be adequately designed and include appropriate plant materials. Furthermore, in addition to managing the on-site run[-]off, the storm[-]water system has been designed to convey the offsite flows that drain to the property from storm events.
....
There remains an inconsistency between avoiding infiltration of storm[-]water to protect the karst geology and infiltrating large volumes of treated wastewater effluent on the same site. I have deferred to the geology expert on this issue. However, once some technical corrections are made to the run[-]off analysis, the applicant will likely be faced with choosing to enhance groundwater recharge to meet the requirements *364 of the Regulations or obtain a NJDEP waiver for recharge because of the karst geology present. NJDEP recognizes the dilemma posed by this situation and has addressed the issue by granting waivers from the recharge requirement in the past, but with this development proposal, the likelihood that such a waiver would be issued may be questionable since the applicant is proposing infiltration for the treated wastewater effluent while simultaneously claiming that infiltration of storm[-]water is incompatible with the soils.
Although the proposed storm[-]water management plan for the River Walk development does not presently precisely comply with the New Jersey Storm[-]water Regulations or the Residential Site Improvement Standards, it is my opinion that with minor technical discrepancies corrected, the plan will comply with the applicable regulations. Once the minor technical discrepancies are corrected, if the groundwater recharge requirements are not met, the applicant must either obtain a waiver from NJDEP on this requirement (because of the karst geology) or redesign the storm[-]water management system to provide the required recharge.
As already noted, after reviewing the record and hearing argument on the challenge to the Board's resolution, Judge Allison Accurso reversed the Board's decision to deny plaintiff's application for preliminary major subdivision approval, and remanded the matter to the Board for "continued public hearing(s)" and entry of an order granting plaintiff conditional subdivision approval if "[p]laintiff can demonstrate correction of [specified] technical deficiencies" or obtains "a waiver from the NJDEP" of its Storm-water Management Rules. The order further required conditional "preliminary major subdivision approval upon the issuance of New Jersey Pollution Discharge Elimination System permits ('NJDES') by the NJDEP."
While we acknowledge that, under a normal scope of review, the record would support the Board's resolution and denial of subdivision approval if the Board exercised exclusive jurisdiction over the application, we affirm the judgment substantially for the reasons stated by Judge Accurso. This is a case in which the DEP can exercise jurisdiction to review the subjects in dispute, and as the Township had already committed the site to satisfy its affordable housing obligation, its Land Use Board can no longer protect its uniquely local interest or exclusively exercise its right to prevent approval in the way a local Planning Board otherwise would.
Contrary to the Board's assertion, the case was not "a straight-forward prerogative writ challenge" to the Board's determinations regarding the proposed on-site sewage disposal system and compliance with the DEP's new storm-water management rules. Moreover, it is clear that DEP, within its jurisdiction, was fully investigating and carefully considering all aspects of the project, and that valid public concerns will not be ignored.

III.
The Board contends that all of the experts at the hearings before the Board, including plaintiff's own geo-technical expert, Tully, voiced concerns about the carbonate geology of the site, and the tendency for sinkholes to form in that type of area. Tully had identified the creation of five new large sinkholes between October 2003 and December 2004, and had testified that water was the catalyst in sinkhole development. With further testimony explaining that the system's proposed daily output of 100,000 gallons of wastewater *365 was the approximate equivalent of .84 inches of daily rainfall in perpetuity, the Board argued that more questions were raised than answered as to how the system could continue to operate in the likely event of sinkhole development. Accordingly, the Board argues that "it would have been an utter abrogation of its responsibility" had the Board granted the preliminary major subdivision approval.
The Board maintains that conditional approval was inappropriate. PRO asserts that COAH's review and determination of suitability was not based on any hearing or findings of fact based on an evidentiary record, and therefore COAH's decision to grant substantive certification based upon the plan to create the River Walk development was not entitled to deference and is not material to the issues before the Board or on this appeal. PRO also argues that the trial court ignored the substantial evidence standard of review that should have been applied. In that connection, PRO asserts that the expert testimony showed serious concerns about the advisability of discharging large volumes of water onto the site, and the Board's view that the experts favoring the sewage disposal system lacked credibility was reasonable. PRO further contends that the court erred by determining that the Board should have delegated to the DEP the determination regarding feasibility of the proposed sewage disposal systems. Finally, PRO cites N.J.S.A. 40:55D-22(b)[5] for the proposition that the MLUL authorizes conditional approvals only "in appropriate instances," and that sewage disposal feasibility should be determined by the Board before a conditional approval can be appropriate.

A.
In her decision reversing the Board's denial of the preliminary major subdivision application, Judge Accurso described the "arbitrary, capricious or unreasonable" scope of review, case law and ordinance provisions relevant to the matter. She stated "[h]ere the issue really is... the feasibility of this disposal field," and added that ultimately the issue turns on "whether in reviewing ... the ordinance standard, the 148-12 Subsection 15, and the EIS provisions the board was authorized to deny preliminary major subdivision approval because the board determined that the site underlaying [sic] with limestone was unsuitable for 100,000 gallons per day of discharge of treated effluent." After reviewing the language of the ordinance provisions, the judge noted that in considering an NJPDES permit for a site, the DEP "can and does analyze the underlying soils to determine the safety of the disposal field." She considered it important "that the only real issue here, in terms of the waste water [sic] management plan is ... the safety of the 4.4 acres of disposal bed." She noted "[t]he board's concern that sinkholes could develop in [the] disposal bed," and that there was "no concern" that the houses, roads, or "any of the infrastructure" of the development would be at risk if the sewage disposal system created the sinkholes.
The court found that this case was more like W.L. Goodfellows & Co. v. Washington Twp. Planning Bd., 345 N.J.Super. 109, 783 A.2d 750 (App.Div.2001), than Field v. Mayor & Council of Twp. of *366 Franklin, 190 N.J.Super. 326, 463 A.2d 391 (App.Div.1983), certif. denied, 95 N.J. 183, 470 A.2d 409 (1983), and Morris County Fair Housing Council v. Boonton Twp., 228 N.J.Super. 635, 550 A.2d 777 (Law Div.1988), stating that:
if you think about feasibility, not as permitability, whether the applicant will be successful in getting itsits NJPDES permit that's an issue that's only going to be determined by D.E.P.
Judge Accurso, in essence, concluded plaintiff desired to employ "recognized technology," and that "the NJPDES permit [process] will ... do what the board attempted to do here which is to make a final determination as to whether that disposal field could safely accept that ... 100,000 gallons of treated effluent over time." She stated:
D.E.P. standards for thefor permitting or for allowing a permit for a waste water [sic] discharge system are a great deal more detailed than what the township planned. In fact, aswhat the township ordinances contemplate. Mr. Mulhall, ... thethe court appointed expert, notes that ... the ordinances don't give any guidance as toto the applicant as to the level of detail that the applicant needed tothethe level of exploration and data that the applicant needed to present to the board to demonstrate feasibility. That should give one some sense that, in fact, what the board ask of this applicant in terms ofof feasibility went beyond what was provided in its own ordinances.
The court stated further that, in view of the extent of the information that Centex had supplied to the Board, "it can't be seriously contested that the information wasn't provided. So in that way the application complied with all the technical and submission requirements under all those sections of the ordinance, the EIS sections as well as thethe feasibility of sewage disposal section," and
the ordinances provide no further guidance as to what the applicant needed to show to demonstrate feasibility of the safety of thisof this disposal bed, and that's clear because it wasn't intended, it doesn't approve the safety of a disposal bed. And that's not what I believe feasibility isis intended to require.
The court also noted that its two court-appointed experts "both agree that there's no issue as to the suitability of the site for everything other than this particular disposal... field," that the safety of the disposal bed was the only arguable issue, with Balsavage opining that the site was suitable for the sewage-disposal system, and Mulhall stating that "it may be suitable, but in order to reach that conclusion additional investigation of geologic and hydro-geologic conditions must be conducted. None of which the applicant can turn to the ordinance to find the sort of guidance that's required." Regarding the significance of these divergent views by the court's experts, the court stated:
I don't conclude, as do the defendants in this matter, that simply because there's expert testimony on both sides and one expert determines that thethe board was correct and that the system was not suitable, ... that requires the Court to determine thatthat the board didn't act arbitrar[il]y or capriciously. I think that's because you have to focus on what the board was asking the applicant to do, and how far does a feasibility determination go.
Significantly, the court went on to consider the DEP's role, stating:

All the parties agree, and I think it's clear, that D.E.P. has primary jurisdiction regarding waste water [sic] management systems and their impact on geological conditions. While Mr. Webster *367 notes that D.E.P. itself doesn't have any standards for determining whether the geologic conditions underlying a site will or won't allow thethe provision of a NJPDES permit, I don't think it there's any dispute that D.E.P. clearly has the ability to deny a NJPDES permit on the basis that it determines that thethe limestone conditions underlying this disposal field won't safely allow thethe load that 100,000 gallons a day will put on theon the underlying rock. But it is D.E.P's province to determine whether that disposal field is safe. And in using feasibility toto require the applicant to demonstrate feasibility is such a level, I think that the board has arrogated to itself the province of D.E.P to decide on the appropriateness of a NJPDES permit.
In order to get its NJPDES permit the plaintiff will have to demonstrate the safety of the system. Specifically, that the system can discharge the designed 100,000 gallons of treated effluent each day on to that 4.4 acre disposal bed without risking the beds collapse due to the sink hole formation.
[(emphasis added).]
The court also considered it significant that the Board and PRO "both can see that had the plaintiff obtained its NJPDES permit before seeking or during the course of seeking its approval, that the board could not deny this application on the basis of thethe safety of the disposal field." Judge Accurso thus noted that, "while the defendants protest that that's a hypothetical, and it didn't happen that way," in the court's view "the point of that that discussion is the insight it gives you into who's [sic] decision this is to make." Conversely, the court suggested that if the Board "determined that the site is not suitable, that the disposal bed can't be proved safe," that decision "hasn't anything to do with D.E.P. It couldn't preempt D.E.P from determining just the opposite." The court therefore held that DEP "has primary jurisdiction. And whoand that D.E.P is in a much better position" to review the suitability and safety of the disposal system.
The court also found that the DEP was willing to take on that obligation, noting:
D.E.P has already raised concerns, requested additional information regarding the impact of limestone within the township, and details on how the waste water management plan will address the issue. The D.E.P's review letter dated June 16th, 2004 makes clear that this is going to be an issue at the D.E.P, not just at the NJPDES permit level, but also at the plan amendment level. D.E.P has issued a second request for to theto the applicant for additional porosity data of the underlying bed rock to determine the extent ofof format those formations within the area of disposal. And its warned the applicant that the presence of limestone within the area of disposal may require alternate discharge limitations for pH to insure the structstructural integrity of the formation is not adversely affected by the interaction of waste water [sic] and limestone.

Clearly these issues are already of concern toto D.E.P. Both theboth the township, as well as any private party, is free to bring additional information to the attention of D.E.P in this regard. And I think it impossible to conclude thatimpossible not to conclude that should D.E.P grant a NJPDES permit, without consideration of the underlying site conditions, that permit could be successfully challenged as arbitrary and capricious. And I also note here that, regardless ofof theof the disagreement over who's obligation *368 it was to go forward with the waste water management plan amendment, it's clear that until that plan amendment is issued, the NJPDES permit cannot be issued. And that's clear in the record from the letter from the D.E.P dated May 18th, 2004 entitled NJPDES Permit Application Request for Additional Technical Information, that letter states, "The department cannot issue a final NJPDES GGW [sic] permit until a determination to awto amend the water[-]quality management plan has been adopted."
[(emphasis added).][6]
In view of these considerations, the court concluded as to the wastewater issue
that the board did act arbitrarily and capriciously. It had thethe applicant had demonstrated feasibility, not permitability. But there was nothing to prohibit thethe board from conditioning the preliminary subdivision approval on the applicant obtaining the NJPDES permit. And, in fact, I conclude that on the basis of all of the information submitted, that the board basically ended upit took a lot of testimony from experts, but it was operating without standards.
It cannothow does the applicant prove its suitability forit had provided all of the information that the board requested, that the ordinances demanded, as to the underlying geology. I think it successfully proved that, without question, that the site is safe for the development ofofof the houses, the infrastructure, the utilities. The issue really is very, very limited to the safety of this 4.4 acre site with the discharge of 100,000 gallons of treated effluent. And it just simply is beyond the kin [sic] of of this board to reallyit'sit's arrogating to itself the NJPDES permit, the ability toto determine the NJPDES permit on the issue of the safety of that bed, not regarding the treatment of the effluent, but clearly of the safety of that bed, and it doesn't have adequate standard[s] in its ordinance to do so. And even if it did, II don't know that it wouldn't be precluded.
We agree with the bottom line that, in essence, the sewage disposal system issue should be resolved by the DEP, that the DEP has the expertise, interest and jurisdiction to resolve it, and that if the requisite NJPDES permit is ultimately granted by DEP, the interests of the Township and its citizens will be protected.
We acknowledge "that when a reviewing court is considering an appeal from an action taken by a planning board, the standard employed is whether the grant or denial was arbitrary, capricious or unreasonable." Fallone Props., L.L.C. v. Bethlehem Twp. Planning Bd., 369 N.J.Super. 552, 560-62, 849 A.2d 1117 (App.Div.2004) (citing Burbridge v. Mine Hill Twp., 117 N.J. 376, 385, 568 A.2d 527 (1990); Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965); and Med. Ctr. v. Princeton Zoning Bd. of Adjustment, 343 N.J.Super. 177, 198, 778 A.2d 482 (App.Div.2001)). However, "[a]lthough a municipality's informal interpretation of an ordinance is entitled to deference, that deference is not limitless. As with other legislative provisions, the meaning of an ordinance's language is a question of law that [courts] review de novo." *369 Bubis v. Kassin, 184 N.J. 612, 627, 878 A.2d 815 (2005) (citation omitted). "The purpose of judicial review is for the court to determine whether or not the board acted within the statutory guidelines and properly exercised its discretion." Fallone Props., supra, 369 N.J.Super. at 561, 849 A.2d 1117 (citing Burbridge, supra, 117 N.J. at 384-85, 568 A.2d 527). Furthermore, "[a] reviewing court is not to `suggest a decision that may be better than the one made by the board of adjustment or planning board, but to determine whether the board could reasonably have reached its decision.'" Ibid. (quoting Davis Enters. v. Karpf, 105 N.J. 476, 485, 523 A.2d 137 (1987)). We are bound by the same standards as was the trial court. Id. at 562, 849 A.2d 1117.
Judge Accurso noted that the ordinance did not define "feasibility," and suggests that "feasibility" must mean something less than "permittability." She explained this conclusion very thoroughly, and correctly suggested that had a DEP permit been issued, the Board could not have concluded that Centex had provided insufficient documentation of feasibility.
We need not, in any event, consider if the findings were compatible with the municipal ordinance because Judge Accurso also concluded that the DEP had primary jurisdiction regarding the safety of using the proposed method of wastewater disposal on this site. As discussed in New Jersey Builders Ass'n v. Department of Environmental Protection, 169 N.J.Super. 76, 85-86, 404 A.2d 320 (App.Div.), certif. denied, 81 N.J. 402, 408 A.2d 796 (1979) (a case challenging DEP water-quality regulations),
there are three acts in Title 58 of the Revised Statutes which seek to promote water quality and aid the ecosystem: the Water Pollution Control Act focuses on water quality standards and a permit system; the Safe Drinking Water Act centers on drinking water treatment plants, and the Water Quality Standards Act deals with areawide waste[-]management planning. All of the acts seek to prevent the degradation of water quality and to preserve the environment. All of the acts give the DEP Commissioner the power to protect ground water [sic] and surface water. All of the acts seek to lessen the impact of pollution from point sources and nonpoint sources. Undoubtedly, given the breadth of the legislation, its goal to promote public health and welfare through preservation of water quality and the environment, any question about the jurisdiction of the DEP Commissioner presumptively should be resolved in his favor. Where a statute seeks to promote a public purpose, it should be liberally construed.
The New Jersey Water Pollution Control Act was intended to "continue and extend the powers and responsibilities of the [DEP] for administering the State's water pollution control program, so that the State may be enabled to implement the permit system required by the Federal [Water Pollution Control] Act." Id. at 83, 404 A.2d 320 (quoting N.J.S.A. 58:10A-2). Similarly, "[a]s a result of federal and State statutory action, it is required that areawide waste treatment management plans be developed." N.J. Builders Ass'n v. Fenske, 249 N.J.Super. 60, 72-73, 591 A.2d 1362 (App.Div.1991) (citing 33 U.S.C.A. § 1288 and N.J.S.A. 58:11A-7).
It is clear, and undisputed, that a municipal ordinance cannot permit a wastewater discharge system inconsistent with DEP requirements, see N.J.S.A. 40:55D-38(b)(13),[7] and the MLUL provides *370 that "[i]n the event that development proposed by an application for development requires an approval by a governmental agency other than the municipal agency, the municipal agency shall, in appropriate instances, condition its approval upon the subsequent approval of such governmental agency[.]" N.J.S.A. 40:55D-22(b). We thus agree with Judge Accurso that the primary review of the proposed wastewater disposal system rested with DEP which was appropriately exercising its jurisdiction in this case. And deference to the DEP is especially appropriate in this case because the Board's disapproval of this project effectively upended years of planning for the site to accommodate the municipality's constitutionally required share of the region's affordable housing needs.
As Judge Accurso stated, Field, supra, 190 N.J.Super. 326, 463 A.2d 391, is distinguishable. It is true, as defendants note, that in Field we said:
It is evident that a municipality cannot guide the use and development of lands in this state if fundamental elements of a development plan are left unresolved before preliminary approval, leaving them instead for an unspecified later day. See Manalapan Holding Co. v. Hamilton Twp. Planning Bd., 184 N.J.Super. 99, 107, 445 A.2d 410 (App.Div.1982), rev'd on other grounds, 92 N.J. 466, 457 A.2d 441 (1983). Certain elementsfor example, drainage, sewage disposal and water supplymay have such a pervasive impact on the public health and welfare in the community that they must be resolved at least as to feasibility of specific proposals or solutions before preliminary approval is granted. See Hilton Acres v. Klein, 35 N.J. 570, 586, 174 A.2d 465 (1961); Hamlin v. Matarazzo, 120 N.J.Super. 164, 174, 293 A.2d 450 (Law Div.1972). If the applicant fails to provide sufficient information on the fundamental elements of his plan, preliminary approval should be denied. See N.J.S.A. 40:55D-45.
[Id. at 332-33, 463 A.2d 391.]
It is also true that we held the land-use board could not grant conditional subdivision approval when the feasibility of fundamental elements had not been established and the feasibility of the sewage disposal system had not been resolved before the planning board.[8] The applicant there proposed three possible options to provide sanitary sewerage to the development, and in upholding the Township Council's remand to the Planning Board, we were satisfied "that the Township Council correctly found that Field failed to provide sufficient information with regard to the feasibility of his three sewage disposal options," and that "[t]he Council's determination is equivalent to a finding that the Planning Board had insufficient information to allow it to consider and resolve a fundamental element of the development plan, notwithstanding the necessity of subsequent governmental approval." Ibid. (citing Manalapan Holding Co., supra, 184 N.J.Super. at 107, 445 A.2d 410). We considered it "appropriate for the Planning Board, on receipt and analysis of specific proof with regard to each option, to determine which option would be most desirable for the community in general and to mandate *371 the priority of such option, subject only to availability and further approval by the appropriate public agencies." Id. at 333-34, 463 A.2d 391. Accordingly, we modified the trial court's judgment "to reinstate the ruling of the Township Council remanding the sewage disposal issue to the Planning Board for further proof and additional findings." Id. at 335, 463 A.2d 391.
Here the River Walk proposal presented a specific approach for sewage treatment and disposal, rather than three different choices. The River Walk treatment plan was described in great detail before the Board and the experts analyzed and testified about the proposal. Thus, as the judge noted, plaintiff did not "fail[] ... to provide sufficient information on the fundamental elements of [the] plan," and the Board was not justified in denying preliminary approval for that reason. Moreover, DEP approval would in any event be required, and although affordable housing issues were present in the Field case and we stated "[p]rovision of a reasonable or proportionate number of lowand moderateincome units may not be postponed for another phase" id. at 334, 463 A.2d 391, it does not appear from the opinion that Field involved a site that the municipality designated as an inclusionary site in order to obtain substantive certification or settle litigation, as in the present case.
In W.L. Goodfellows, supra, 345 N.J.Super. at 111-12, 783 A.2d 750, a planning board denied an application for preliminary site plan approval, based upon the plaintiff's failure to demonstrate that it had secured a drainage easement, even though the plaintiff was involved in negotiations to secure that easement. Citing Field, we said that "[b]ecause drainage and sewage may have a pervasive impact on the public health and welfare, we have recognized that the feasibility of specific proposals or solutions must be resolved before preliminary approval is given." Id. at 116-17, 783 A.2d 750. We nevertheless concluded that "sufficient information was presented by plaintiff concerning the specificity of its drainage plan, including its feasibility and adequacy, to require the Board to grant preliminary site plan approval condition[ed] upon production of an easement that complied with the drainage plan under review." Id. at 117, 783 A.2d 750. We noted:
The record is bare of any testimony from the Planner that plaintiff's plan lacked the required specificity to permit him to pass upon its appropriateness. Most telling was the Board's Engineer's testimony that he reviewed the drainage plan and the area involved, made his calculations, and was confident that it could support the additional facility and would work. He added that the system proposed was "permissible" under the Township's ordinance.
[Ibid.]
Thus, the Board Engineer in Goodfellows supported the viability of the drainage plan, whereas in this case the Board's professionals were not satisfied with the proposed sewage system or wastewater disposal system. However, Goodfellows cannot be read to support the unconditional denial of subdivision approval in this case where DEP review is warranted. This is particularly so because the trial court in exercising its prerogative writ jurisdiction found that the sewage system was "feasible," and that the issue properly before the Board was only whether the proposal was sufficient to obtain approval. See also Morris County Fair Housing Council, supra, 228 N.J.Super. at 638-39, 550 A.2d 777 (involving an application by owners of property rezoned for affordable housing as the result of the municipality's settlement of Mount Laurel litigation with *372 the Public Advocate). There, Judge Skillman, sitting in the Law Division, held:
the planning board did not abuse its discretion in concluding that this was not an "appropriate instance" for the grant of site plan approval subject to approval of proposed modifications of the dam by the Commissioner of DEP. The modifications required in the reservoir and dam, which are subject to review by the Commissioner of DEP, are directly related to the adequacy of the Corteses' storm [sic] water management plan, which the planning board has the responsibility to pass upon. Therefore, the board reasonably concluded that it could not determine the adequacy of the Corteses' storm[-]water management plan until the Commissioner of DEP decided what modifications must be made in the reservoir and dam.
[Id. at 646, 550 A.2d 777.]
In other words, the issue presented there was different; the question dealt with whether the Planning Board had to pass upon the adequacy of the storm-water management plan before the DEP exercised its responsibility as to dam-safety issues. Given that necessary sequence and issue involved, the board did not abuse its discretion in denying conditional approval. Id. at 641, 645-46, 550 A.2d 777.
In contrast, in the present case the Board did not merely conclude that its decision needed to await the DEP's decision as to the safety of the proposed wastewater disposal system. Moreover, as previously stated, if the DEP determines that the disposal system was safe and the technical storm-water issues were adequately addressed, the subdivision application would have to be granted because there would be no basis for denial by the Board.
We also note the Law Division has said:
The DEP, not the Board of Adjustment, has regulatory authority in the area of sewage disposal and may, as it did in this case, approve off-site treatment. Because the Township is a municipality without a public wastewater collection and treatment system, septic systems are mandatory for any land use that generates sewage. Sewage must be treated to reduce contaminants prior to discharge to soil. N.J.S.A. 58:10A-6(d)(3). The location, design, construction, and operation of a septic system are within the exclusive jurisdiction of the DEP. The Board of Adjustment had no power to interfere with the DEP in the exercise of its statutory responsibility and regulatory authority in the area of sewage disposal. See Holgate Prop. Assocs. v. Twp. of Howell, 145 N.J. 590, 679 A.2d 613 (1996) (analysis of the preclusion of the municipal zoning ordinance by the Water Pollution Control Act and the Solid Waste Management Act).
[Isihos Bros. P'ship v. Twp. of Franklin, 376 N.J.Super. 591, 596-97, 871 A.2d 152 (Law Div.2000).]
This language supports Judge Accurso's decision that the Board should have granted preliminary subdivision approval conditioned upon the DEP's granting of the necessary NJPDES permit and water quality management plan amendments.[9]
We do not dispute the appellants' contentions regarding the jurisdiction and responsibilities of the defendant Land Use Board. But even recognizing the traditional *373 jurisdiction of the Board, whether primary or concurrent, we are satisfied that the trial court did not inappropriately deem that the circumstances of this case warrant the primary decision-making by the DEP.

B.
PRO also argues that the court should have upheld the Board's finding that the storm-water rules were not satisfied.
Judge Accurso noted that, because the DEP storm-water rules changed during the hearings,[10] "both the applicant's engineer, and the board's engineers were struggling," and that the court-appointed expert, Cosgrove, had the benefit of additional DEP guidance at the time of his report. As detailed above, Cosgrove, the independent expert, concluded that the proposed storm-water management system was sound and effective aside from several "minor technical discrepancies in the storm[-]water calculations," and had met the requirements of the regulations to provide nonstructural storm-water management strategies. The court, therefore, held:
it's my opinion that with minor technical discrepancies corrected the plan will comply with the applicable regulations. Once the minor technical discrepancies are corrected, if the ground[-]discharge requirements are not met the applicant must either obtain a waiver from D.E.P on this requirement because [of] the [karst] geology or redesign the storm[-]water management system to provide the required discharge.
I think that all parties would agree that on this point a remand is appropriate to allow thethe calculations to be redone. And, at that point, I believe it will be a pretty simple matter to determining whetherwhether the run [-]off, or I should say it a better way, whether infiltration is maintained or reduced or whether there's going to be a requirement for a waiver in that regard.
N.J.A.C. 7:8-5.2(a) now provides:
Storm[-]water management measures for major development shall be developed to meet the erosion control, groundwater recharge, storm[-]water runoff quantity, and storm [-]water runoff quality standards at N.J.A.C. 7:8-5.4 and 5.5. To the maximum extent practicable, these standards shall be met by incorporating nonstructural storm [-]water management strategies at N.J.A.C. 7:8-5.3 into the design. If these measures alone are not sufficient to meet these standards, structural storm[-]water management measures at N.J.A.C. 7:8-5.7 necessary to meet these standards shall be incorporated into the design.
N.J.A.C. 7:8-5.3(a) provides that: "If the applicant contends that it is not feasible for engineering, environmental, or safety reasons to incorporate any nonstructural storm[-]water management strategies identified in (b) below into the design of a particular project, the applicant shall identify the strategy and provide a basis for the contention."
Although PRO is correct that the trial court had the benefit of knowledge and expert testimony that had not been available *374 before the Board, the trial court's decision was designed to assure that the subject be addressed in a timely fashion in view of the amended regulations. The subject was actually remanded to the Board, althoughas with the sewage-disposal issueit may ultimately be for the DEP, not the Board, to determine whether plaintiff adequately met the DEP's regulations on this point. As with the disposal system issues, the court's approach reasonably allows the subdivision application to proceed expeditiously, consistent with the Mt. Laurel settlement and COAH certification.

C.
Through the FHA, under COAH's oversight, the Legislature has permitted municipalities to designate where they will accommodate affordable housing within their borders and to obtain substantive certification, thereby substantially protecting the municipality from the threat of a builder's remedy lawsuit. Harmony Township gained protection from builder's remedy actions and substantive certification by including plaintiff's site as a location for inclusionary housing. As a result, the Township's ordinances should not be construed in a manner that undermines the goal of providing inclusionary housing on the site if a reasonable interpretation of the ordinances would allow for it. In that context, if the ordinances can be construed to allow for the Board to conditionally approve the development subject to DEP's approval of viable sewage-disposal and storm-water systems, they should be so interpreted.
Accordingly, as other aspects of the subdivision application were found to be satisfactory to the Board, and the construction of affordable housing furthered a settlement of the Mt. Laurel litigation and satisfied the municipality's fair share obligation, the Board should have delayed the project no longer, and conditionally approved the site plan, subject to obtaining the necessary DEP approval and permits. See N.J.S.A. 40:55D-22(b).
To the extent PRO asserts that the impact of the affordable-housing issues and the impact of the substantive certification was not properly before the court, and the matter should have been referred to COAH, we disagree.[11] The Mt. Laurel litigation had been settled and substantive certification achieved, and that is so even though Centex Homes has terminated its interest as developer of the site. There was no basis on which to delay the application or disposition of the prerogative-writ litigation for any presentation to COAH.
The judgment is affirmed.
NOTES
[1] The Board is appellant in A-5564-06T3, and Phillipsburg Riverview Organization (PRO) is appellant in A-5650-06T3. We consolidated the appeals for purposes of this opinion. Centex Homes, the developer, was a co-plaintiff until dismissed from the action.
[2] The court also permitted the Board to condition the approval on other conditions or approvals not contested on this appeal. There is no contention the order of May 21, 2007, does not constitute a final judgment.
[3] The appellants insist that the record clearly supports the Board's determination that the proposed sewage disposal system was not feasible. PRO adds that "the storm water management system did not meet the required standards."
[4] As noted previously, NJPDES refers to the New Jersey Pollutant Discharge Elimination System.
[5] N.J.S.A. 40:55D-22(b) provides, in part, that "[i]n the event that development proposed by an application for development requires an approval by a governmental agency other than the municipal agency, the municipal agency shall, in appropriate instances, condition its approval upon the subsequent approval of such government agency...." The issue before us, of course, is whether the conditional approval of a local land use board may be bypassed when approval of a State agency is required.
[6] The judge also noted that the Township "knew of the condition [of the land] when it was represented in 2001 to COAH that the affordable housing project could be constructed with an on-site treatment effluent disposal system." The judge also noted the Township did not "expedite the application for development" as it agreed to do, and "spent a great deal of time on issues which it now acknowledges are irrelevant."
[7] The same is true regarding storm-water management. See N.J.S.A. 40:55D-38(b)(3)(14).
[8] We also agree with PRO that Pizzo Mantin Group v. Twp. of Randolph, 137 N.J. 216, 645 A.2d 89 (1994), dealt with a situation in which the MLUL "grants power to enact an ordinance on a particular subject," and that "Pizzo Mantin and Field comfortably co-exist." We proceed, as does PRO, on the basis that "the lower court correctly found that the Pizzo Mantin doctrine was irrelevant to this case."
[9] Isihos Brothers has been criticized for relying on a case "finding state preemption in a wholly unrelated area" and for reaching that conclusion "without engaging in the analysis required to determine whether particular State regulation preempts local activity[.]" Cox, New Jersey Zoning and Land Use Administration § 37-3.4 at 885-86 (Gann 2008).
[10] On February 2, 2004, the DEP adopted N.J.A.C. 7:8-5.5(h), as part of a comprehensive scheme governing stormwater management, see N.J.A.C. 7:8-1.1 to -6.3, repealing then existing stormwater management rules. In re Stormwater Management Rules, 384 N.J.Super. 451, 453, 894 A.2d 1241 (App.Div.), certif. denied, 188 N.J. 489, 909 A.2d 724 (2006). The River Walk application was filed under the former rules, but during the hearings, Centex agreed that it needed to "apply and adhere to" the new rules.
[11] PRO insists that as the Board and Harmony Township are separate legal entities, the Township's actions as to affordable housing "cannot govern decisions made by the Board." Hence, PRO contends the Board's proper decision based on the record should be "upheld," and the "goal" of affordable housing should be "achieved" by amendment of the Township's affordable housing plan "through proceedings before COAH." It also asserts that the impact of the Board's decision on the affordable-housing settlement should be addressed before COAH and was not relevant in these proceedings. In its reply brief, PRO adds "[t]he issue is ... how this Court should resolve the tension between the Board's decision on feasibility and the Township's prior actions. Legally, the only way to resolve disagreements between land[-]use boards and townships about the feasibility of inclusionary developments is to refer the matter to COAH."